### BEST v. UNITED STATES.
### No. 4363.

United States Court of Appeals
First Circuit.

July 6, 1950.

See also, 76 Fed.Supp. 138, 857.

Henry M. Leen, Boston, Mass. (Charles W. Bartlett and David E. Place, Boston, Mass., with him on brief), Robert H. Best, pro se, for appellant.

Fred E. Strine, Special Assistant to the Attorney General (George F. Garrity, United States Attorney, Boston, Mass., and Rosalie M. Moynahan, Attorney, Department of Justice, Washington, D. C., with him on brief), for appellee.

Before MAGRUDER, Chief Judge, and GOODRICH and WOODBURY, Circuit Judges.

MAGRUDER, Chief Judge.

This is an appeal from a judgment sentencing Robert H. Best to life imprisonment and a fine of $10,000, upon a conviction by a jury on an indictment charging the crime of treason against the United States. The charge was predicated upon appellant's radio broadcasting activities within Germany and Austria during World War II, under the auspices of the German Radio Broadcasting Company, an agency of the German Government under the jurisdiction of the Ministry of Public Enlightenment and Propaganda. The case bears a close resemblance to Chandler v. United States, 1 Cir., 1948, 171 F.2d 921,

certiorari denied 1949, 336 U.S. 918, 69 S. Ct. 640, 93 L.Ed. 1081, in respect of the form and substance of the indictment, the nature of the evidence upon which conviction was had, and for the most part the legal questions raised on appeal.

There was little or no conflict in the testimony, certainly not in any important particular. On the evidence, the jury were warranted in finding the following:

Best was born in Sumter, South Carolina, on April 16, 1896, the son of an itinerant Methodist preacher. He was, then, an American citizen from birth, and he has remained such throughout. After receiving a high school and college education, he entered the U.S. military service during World War I. Afterwards, he attended the School of Journalism at Columbia University. Upon his graduation in 1922 he went abroad on a Pulitzer traveling fellowship, and traveled extensively in Europe. Toward the end of 1922, Best came to Vienna, which he liked very much. He settled down there, and from time to time did journalistic work for various English and American newspapers, but chiefly he became a "stringer", or free-lance correspondent, for the United Press.

After the Nazis came to power in Germany, Best found much to admire in the Hitler regime. He became more and more fanatically anti-Jewish and anti-Communist. In the summer of 1941 he made overtures to be allowed to broadcast to America over the German radio, to warn against certain tendencies in the foreign policy of the Government of the United States; but no such arrangement was consummated at that time.

When the Japanese attack on Pearl Harbor brought the United States into the war, Best was promptly taken into custody in Vienna by the Gestapo and held in jail. A few days thereafter he was lodged in an internment camp in Bad Nauheim, Germany, with a group of American journalists and diplomats, chief of whom was Leland M. Morris, who had been Chargé d'Affaires at the U.S. Embassy in Berlin. Best informed Morris of his desire to remain in Germany during the war. Morris objected that Best's name "was on the list of ex-

changeables to go to the United States with the Embassy group, and that his withdrawal would cause negotiation and delay which would complicate the movement of the whole group." Best, however, persisted in his decision to withdraw from this group of exchangeable Americans. His reason for remaining behind, as variously expressed at the time, was that some American ought to stay in Germany to record events and tell the story, or that "an American should remain in Germany to be sort of a mediator, a go-between, after Hitler had won the war; someone who would interpret the German mind to Americans and the American mind to Germans." Another inducement perhaps was that Best had in mind to marry a Viennese lady, which in fact later he did.

During his stay at Bad Nauheim, Best communicated with various German officials with reference to his desire to remain in Germany. He was given permission to travel to Berlin unaccompanied, and there he talked to one Rasche, an official of the Press Department of the Foreign Office, who particularly inquired whether Best was still interested in speaking over the German radio. Through Rasche, Best had an interview with Werner Plack, a member of the Radio Division of the Foreign Office, whose "duties included recruiting commentators and speakers for the radio which was beamed to the United States, and assembling material, and generally giving them ideas". According to Best's testimony, Plack "seemed to be interested in sounding me out on my attitude toward various things, and in this connection we discussed, as I recall, quite a bit about the Communist menace to the world, or, as I recall, the Bolshevist menace. And then there was some reference also to the standpoint with regard to the Jewish International, and he brought up certain phases of it." Evidently Best's viewpoint was satisfactory, for arrangements were soon made for him to work in the U.S.A. Zone of the Short Wave Station of the German Radio Broadcasting Company, at a compensation of 1500 Reichsmarks per month, approved by the Propaganda Ministry. This compensation Best characterized as "a bit liberal".

In April, 1942, Best commenced his radio activities in Berlin. At the outset he served in a dual capacity, as a news editor and as a radio commentator.

His job as news editor was to take raw German news items which had been supplied to him, "translating them or writing them into English as he saw fit, and editing them for use in the news service." He also wrote the so-called Bell reports, which "covered the number of allied vessels sunk by German warships, and gave description of the circumstances and where it occurred." At the beginning of these broadcasts "bells were rung to indicate the number of ships sunk, and then there would follow a short commentary by Mr. Best."

Best's commentaries, which were usually recorded for later broadcast, were mostly titled "BBB, Best's Berlin Broadcasts". He was also the author of several shorter commentaries, known as "Best's Little Lifesavers", recorded for broadcasting to American and British troops. Occasionally, also, he substituted for other commentators, including Douglas Chandler. In addition, he participated in frequent roundtable conferences, gatherings of various news commentators of the U.S.A. Zone (among whom, upon occasion, were Douglas Chandler and the notorious "Lord Haw Haw"), at which gatherings the participants "discussed before a microphone certain political issues that had been previously agreed on, but without a recording, everyone being able to express his point of view, within the limits of German directives prohibiting discussion of certain information or certain topics."

The German Short Wave Station was moved to Koenigswusterhausen, a short distance from Berlin, in August, 1943. For a time Best continued to make his recordings there. In November or December of 1943, he expressed to the Radio Attaché of the German Embassy in Italy a willingness to go to Italy to broadcast over the Italian short wave to American and British troops stationed in Italy and Africa, but this particular arrangement was not executed. At the end of 1943 Best was allowed to move to Vienna, after which he ceased his work as a news editor. However, at Vienna

he made recordings of his commentaries, which were transmitted to Koenigswusterhausen and there broadcast to the United States; and he continued there to make such recordings until a few days before the Russian army reached Vienna. Over the whole period, Best made perhaps as many as 300 broadcasts. These broadcasts were monitored and recorded at the monitoring station of the Federal Communications Commission in Silver Hill, Maryland; and numerous witnesses testified to having picked up Best's broadcasts on their short wave receiving sets at scattered points throughout the United States.

Goebbels regularly passed on down through a hierarchy of officials his directives as to the German radio propaganda line. Best frequently attended conferences held by the head of the U.S.A. Zone, who communicated to the commentators the standard directives and daily directives, and told them "what they should write about, what they should not write about, what they should ignore, what they should stress and underline, and which subjects they were to handle in particular any particular day." Best made a gesture of independence, and once went on a "sit-down strike", when his superiors objected to the phraseology of some of his manuscripts, especially in his capacity of news editor. The disagreement seems to have been not as to fundamental subject matter, but certain of the German officials thought, not without reason, that expressions used by Best were so vicious and intemperate in tone as to be self-defeating as propaganda. Best was indulged and humored a bit by the officials, presumably because his work as a whole was regarded by them as useful to the German cause, and some compromise was patched up. Of course, all of Best's manuscripts or recordings were subjected both to military and political censorship prior to broadcasting. On the issue of appellant's treasonable intent, seven authenticated recordings of appellant's broadcasts were played back at the trial, and manuscripts of ten of the "BBB" broadcasts were read to the jury. In these exhibits may be found all the main Nazi propaganda themes, with particular emphasis upon the alleged

menace of a Jewish world-wide conspiracy and Jewish infiltration into controlling positions in the Government of the United States, and also upon the depicting of Hitler's Germany as a great bulwark of Christianity and civilization against Bolshevism.

Appellant was thoroughly aware of the objective of the pyschological warfare being waged over the German short wave radio, including the U.S.A. Zone. It was to foster a spirit of defeatism, of hopelessness in the face of vaunted German might; to induce an overwhelming war-weariness among the members of the U.S. armed forces and the civilian population; to insinuate into the minds of the American people a conviction that they had been betrayed and tricked into an unholy war by faithless leaders who were responsive to the machinations of the Jewish-Bolshevist conspirators; to sow the seeds of disunity at home and distrust of the countries allied with the United States in the war. To the extent that this elaborate radio propaganda should succeed in undermining the moral and spiritual stamina of the American people, so much the easier, it was anticipated by the Propaganda Ministry, would be the triumph of the German arms.

In this effort Best was willing, even eager, to play the Nazi game. He fancied himself to have a much truer understanding of American psychology than did his German superiors, and he was continuously making suggestions to them of ways to heighten the effectiveness of the German propaganda warfare over the air waves. In 1944 he wrote to Dr. Ahrens, the head of the U.S.A. section of the Radio Political Division of the German Foreign Office, that the "officials in question have, or apparently have, no idea whatever concerning either the nature or the importance (for Germany in particular) of the work which I am now doing as Rundfunk commentator"; that "the only chance that Germany has of concluding with America a peace which will give her a free hand in protecting Europe against the bolshevist menace is the creation of a so-called war-weariness in America; and that such a war-weariness can be created only by opening the eyes of the real America to the

perfidy of Roosevelt and his kike cronies,— a task in which BBB plays a very important role if I do say so myself." To an official of the Reichs Ministry of Economics he wrote "that Hitler's crusade means such a sacred cause for me that I consider as a saboteur everybody who does not give his all for it." In a letter he wrote to Goebbels, but apparently did not send, he said, "the task of the armed forces can be greatly eased, and the day of victory much hastened, by a more intensive propaganda of a *positive* nature." In a draft which he prepared and submitted to Dr. Ahrens as a suggested text of leaflets to be dropped on American troops in North Africa, he wrote that "you are also engaged on a fool's errand insofar as you either hope or expect ever to visit Europe with a gun in your hand"; that "the only bit of territory that any of you will ever occupy in Europe will be the six feet or so of earth in one of the military graveyards in which we shall bury the remains of any and every man who attempts to force his way into Europe." In one of his broadcasts he sneered at American women, who were expressing in letters to their loved ones in the armed forces their confidence that the warrior boys would return safely home, "and when you do come back you will find, just as you left them, everything your letters tell me that you hold dear"—this in accordance with a suggested form letter appearing in Collier's magazine. Best commented that "the letters themselves together with other intimate possessions of the dead soldiers will soon be returned with the label, 'Fallen in battle', or 'Missing in action'. And for all time to come, the letters will haunt the persons who were simple-minded enough to write them."

Though he assured the American people with gusto and vehemence that the cause of the United Nations was irretrievably lost, it did not turn out so, and Best had to take his departure from Vienna shortly before the arrival of the Russians. He was picked up by the British military authorities on January 29, 1946, in Carinthia, Austria, held in custody for a couple of weeks, and then turned over to the United States Army. At that time there was pending against him in the District of Columbia an indictment for treason which had been handed up by a grand jury in 1943. On December 10, 1946, still in military custody, he, along with Douglas Chandler, was taken by plane to the United States, via Paris, the Azores, and Newfoundland. The intended destination was Washington, D. C., but due to mechanical troubles an unscheduled landing was made at Westover Field, Massachusetts, on December 14, 1946. After three hours' delay in the passengers' lounge at the field, Best was escorted aboard another plane and flown to Washington, where he was handed into custody of the United States Marshal. On December 30, 1946, the present indictment was returned against Best in the United States District Court for the District of Massachusetts. He was arrested in Washington and, pursuant to a warrant for his removal, taken by the Marshal to Boston and delivered to the custody of the U.S. Marshal for the District of Massachusetts.

Best was arraigned in Boston on January 20, 1947, and a plea of not guilty was entered by direction of the court.

Twelve of the 18 overt acts charged in the indictment were submitted to the jury, which returned a verdict of guilty, finding especially that each and every one of the 12 overt acts submitted to it was "a treasonable act committed by the defendant Best with an intent to betray the United States".

Most of the questions of law presented on this appeal were examined and discussed by us, with all the care and thoroughness of which we were capable, in Chandler v. United States, 1 Cir., 1948, 171 F.2d 921, certiorari denied 1949, 336 U.S. 918, 69 S. Ct. 640, 93 L.Ed. 1081. Since then, many of our conclusions have received added support in Gillars v. United States, D.C. Cir., 182 F.2d 962 (opinion by Fahy, Circuit Judge). We have considered appellant's arguments, but find no reason to depart from any of our rulings in the Chandler case. Nor do we see the need in the present case to elaborate further upon those rulings.

■ Under the constitutional and statutory definitions of treason, acts of treason

committed in an enemy country are punishable. Chandler v. United States, 1 Cir., 171 F.2d at 929–931; Gillars v. United States, supra.

■ Appellant's various contentions to the effect that the court below lacked jurisdiction of the subject matter, or of the person of the defendant, are likewise not well taken. Chandler v. United States, 1 Cir., 171 F.2d at 931–936. These contentions, in so far as they were presented in Gillars v. United States, were similarly disposed of in that case.

■ The indictment was not bad for duplicity. Chandler v. United States, 171 F. 2d at 936–937.

■■ As to the sufficiency of the overt acts alleged in the indictment and established by two-witness proof as specially found by the jury, we refer to what we said in the Chandler case, 171 F.2d at 937–942. See accord: Gillars v. United States, supra. In view of the jury's special finding as to each of the 12 overt acts, it is enough if any one of the overt acts, in its setting, warranted a finding that Best actually gave aid and comfort to the enemy. The overt acts, like those submitted to the jury in the Chandler case, relate for the most part to typical routine activities of Best, on identified occasions, in fulfillment of the purpose of his continuous employment as radio commentator and news editor for the German Propaganda Ministry. For instance, one of the overt acts related to Best's participation in a particular round-table conference of commentators, whose unrehearsed discussion and colloquy were recorded by a microphone and subsequently broadcast to the United States. Another overt act established by two-witness proof was Best's making of a live broadcast of a special program prepared by him, in conjunction with a German Luftwaffe officer who had accompanied the German paratroopers participating in the "liberation" of Mussolini. In this broadcast, Best played up the episode as a daring feat of German arms, which did "the world a great favor by rescuing Benito Mussolini from the hands of his would-be murderers in Downing Street and the

White House." The overt acts, viewed in their setting above summarized, were "part and parcel of the totality of aid and comfort given by the course of conduct as a whole." 171 F.2d at 941.

■ The evidence in this case of intent to betray was quite as strong as that presented in the Chandler case. See our discussion in 171 F.2d at 942–944. Best certainly knew that he was dealing with enemy agents. He knew the hostile mission of the German Short Wave Station, which was to facilitate a German military triumph by disintegrating the fighting morale of the American armed forces and the civilian population. He voluntarily hired himself to the German Radio Broadcasting Company, with the intention of contributing to the execution of that hostile mission. Not only did he so contribute, but he was constantly alert to suggest improvements of method whereby the German psychological warfare might be made more effective.

■ Appellant's contention on this branch of the case is that the trial judge erred in making a distinction between "motive" and "intent" in the charge to the jury, and in failing to instruct the jury, in effect, that the defendant could not be found to have had an "intent to betray" the United States, if the motive for his acts was good and was to advance what he thought were the best interests of the United States. In this respect Judge Ford charged the jury in substantially the same terms he used in the Chandler case; and we are more than ever convinced that he was right. As we said in the Chandler case, 171 F.2d at 944: "When war breaks out, a citizen's obligation of allegiance puts definite limits upon his freedom to act on his private judgment. If he trafficks with enemy agents, knowing them to be such, and being aware of their hostile mission intentionally gives them aid in steps essential to the execution of that mission, he has adhered to the enemies of his country, giving them aid and comfort, within our definition of treason. He is guilty of treason, whatever his motive." A country fights its wars one at a time, and takes its allies where it finds them. Best having knowingly aided agents of the enemy in their efforts to bring

about the military defeat of the United States, it is of no consequence that he may have thought it was for the ultimate good of the United States to lose World War II, in order that Hitler might accomplish the destruction of an ally of the United States whom Best regarded as a potential enemy. So far as the legal issues of the present case are concerned, it is entirely irrelevant to speculate whether the present position and prospects of the United States in world affairs are better or worse, as compared with what would probably have been the alternative prospect of facing the final life-and-death struggle with a triumphant Hitler, master of most of the world outside the Americas.

A search and seizure point, which was not presented in the Chandler case, deserves some comment. It concerns a search of Best's Vienna apartment without a judicial warrant by officers of the United States Army of Occupation some weeks after Best had been taken into custody, and seizure of certain documents found there. A motion to suppress made by appellant was the subject of an extensive hearing by the district judge, at which witnesses were heard and affidavits submitted. Judge Ford gave careful consideration to the facts and the law, in a memorandum which appears in 76 F.Supp. 857–865, and concluded, in the unprecedented situation before him, that the motion to suppress should be denied. We refer to this memorandum for a fuller statement of the facts.

For present purposes we assume, and we think it is probably so, that the protection of the Fourth Amendment extends to United States citizens in foreign countries under occupation by our armed forces. Cf. Eisentrager v. Forrestal, 1949, 84 U.S.App.D.C. 396, 174 F.2d 961, 965, rev'd on other grounds sub nom. Johnson v. Eisentrager, 1950, U.S.App.D.C., 70 S.Ct. 956. We do not regard In re Ross, 1891, 140 U.S. 453, at page 464, 11 S.Ct. 897, at page 900, 35 L.Ed. 581, as holding anything to the contrary, notwithstanding the isolated statement therein: "The constitution can have no operation in another country." See Ex parte Bakelite Corp., 1929, 279 U.S. 438, 451, 49 S.Ct. 411, 73 L.Ed.

789. For example, suppose A, a citizen of the United States, goes to Germany to take employment in a civilian capacity under the High Commissioner. He is suspected of having previously transported stolen goods in interstate commerce, in violation of 18 U.S.C.A. § 2314. Agents of the F.B.I., without any search warrant, break into A's dwelling in Germany, ransack the place, find and seize the alleged stolen goods. Upon a subsequent prosecution of A in the United States for that offense, it can hardly be doubted that the evidence so obtained would be excluded as the product of a search and seizure forbidden by the Fourth Amendment. And this would be so, even though no judicial officer had been authorized to issue a warrant for a search in occupied Germany. Obviously, Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of not empowering any judicial officer to act on an application for a warrant. If the search is one which would otherwise be unreasonable, and hence in violation of the Fourth Amendment, without the sanction of a search warrant, then in such a case, for lack of a warrant, no search could lawfully be made.

But the question now at issue is not necessarily concluded in appellant's favor upon the assumption that the United States Army officers who conducted the search were subject to the Fourth Amendment. In the recent case of United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, the Supreme Court stated: "It is unreasonable searches that are prohibited by the Fourth Amendment. Carroll v. United States, 267 U.S. 132, 147, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required." Further, in the same opinion, the Court said: "What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches, and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. Go-Bart Co. v.

United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. Reasonableness is in the first instance for the District Court to determine."

In this connection, it is important to bear in mind that the search here by the military took place in the early months of the military occupation of Austria, with the country still in upheaval and confusion. As one of the officers testified: "We were in the first phase of military occupation; all the functions of government were highly disrupted." The civil courts in Austria had not been restored to their normal activity, and of course had no jurisdiction over the occupying forces. The railroad systems and other public utilities were in operation only on a very limited basis. There was danger of starvation, hospitals were overcrowded, and there was considerable bomb damage, particularly in Vienna. There was at the time a mass migration of populations running into hundreds of thousands milling about, from west to east and north to south, and *vice versa,* with Vienna a "sort of a crossroads for these people".

On August 1, 1945, the Joint Chiefs of Staff, acting under authority delegated by the President as Commander in Chief, had issued a directive to General Mark W. Clark, as Commanding General of U.S. forces of occupation in Austria, investing him with "supreme legislative, executive, and judicial authority in the areas occupied by forces under your command. This authority will be broadly construed and includes authority to take all measures deemed by you necessary, appropriate or desirable in relation to military exigencies and the objectives set forth in this and other directives." The directive went on to define for General Clark the basic objectives of military government in Austria. Thus, paragraph 4a stated: "You will be chiefly concerned in the initial stages of military government with the elimination of German domination and Nazi influences. Consistently with this purpose, you will be guided in every step by the necessity to ensure the reconstruction of Austria as a free, independent and democratic state." In paragraph 4b General Clark was directed to make clear to the Austrian people that the military occupation was intended "to eliminate Nazism, Pan-Germanism, militarism, and other forces opposed to the democratic reconstruction of Austria" and "to cooperate with the Control Council for Germany in the application and enforcement of measures designed to prevent the recurrence of German aggression". Paragraph 5a directed that every effort be made to prevent the reconstitution of the Nazi party or affiliated associations "in underground, disguised or secret form." In paragraph 5d of the directive it was provided: "Property, real and personal, owned or controlled by the Nazi Party, its formations, affiliated associations and supervised organizations, and by all persons subject to arrest under the provisions of paragraph 7 below, and found within your zone will be taken under your control pending a decision by the Allied Council or higher authority as to its eventual disposition." Paragraph 7b of the directive ordered to be arrested and held in custody all persons "who if permitted to remain at large would endanger the accomplishment of your objectives", including any national of any of the United Nations or associated states "who is believed to have committed offenses under his national law in support of the German war effort".

It was under the foregoing authority that Best was taken into custody. The search of the Vienna apartment was not incidental to the arrest, which had occurred earlier and at another place, but was also conducted under authority of the directive of the Joint Chiefs of Staff. The officer who ordered the particular search was Major Benjamin G. Taylor, Jr., who was at the time Chief of the Counter Intelligence Branch, U.S. Forces in Austria. It was his duty to keep the Intelligence Corps informed of "any subversive activities inimicable to the interests of the United States Government and the safety of United States Forces in Austria." He was also authorized "to order and direct the arrest of persons and the seizure of property of interest to Counter Intelligence Agencies." As stated in Major Taylor's affidavit: "With the persons and material thus seized, Counter Intelligence Corps per-

sonnel would attempt to further our knowledge of the Nazi Party personnel and activities in Austria and Germany, in order to aid our mission of breaking up the Nazi Party. Another of the missions assigned to Counter Intelligence Agencies was the capture of persons suspected of treason to the United States. In the case of capture, the same procedure of arrest and seizure of property was followed."

In view of Best's well-known activities in the employment of the German Radio Broadcasting Company, it was not unreasonable to believe that search of the apartment from which he had fled would reveal documents and information shedding light upon the personnel and workings of the Nazi propaganda apparatus, and thus assisting the Counter Intelligence activities of the occupying forces directed to the objective of extirpating the hostile Nazi influence in the country.

The first search of the apartment took place early in March, 1946. At that time the officers found the apartment in considerable disorder, and littered with papers; "it appeared that it was not at that time in use as a habitation." On the occasion of this entry, the officers merely sorted and arranged the documents in accordance with their intelligence value and interest, and prepared a report of the type known in military intelligence work as a "target report". On or about March 19, 1946, a second entry was made, under orders, by a target investigator of the Vienna Documents Center, U.S. Forces in Austria. The officer in charge executed his mission of removing the documents which had been screened and assorted at the time of the earlier search. After the Documents Center finished with the documents, they were transmitted to the Consul General in Vienna, who forwarded them to the State Department in Washington, where they were ultimately turned over to the Department of Justice.

All of the seized papers and documents have since been returned to the defendant, except the items now in question, consisting of manuscripts of a number of propaganda broadcasts written by the defendant, the draft of a propaganda leaflet of the same authorship, and Best's copies of numerous letters written by him to German radio and other officials. After denial of the defendant's motion to suppress, these documents were, over objection, introduced in evidence by the prosecution.

 In the particular setting above outlined, it seems to us that the acts of the military in arresting Best and searching his former apartment were even more clearly within the constitutional sanction of the war power than were the military acts sustained in Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. We are in agreement with the analysis and conclusion of the district judge in the following paragraph of his memorandum denying the motion to suppress, 76 F. Supp. at 864:

"Orders for the search of defendant's apartment and seizure of his property proceeded from the staff of the Commanding General of United States Forces in Austria, to the Commander of the 430th Counter Intelligence Unit, and down the line to his subordinates who executed the search. The military knew that Best was suspected of treason and had been engaged in broadcasting activities for the German Reich. (Affidavits of military persons concerned.) It is not for this court to say that defendant's papers did not constitute a threat to the safety of the military occupation, or that the means employed by the commander were not calculated to remove the threat. Here in the United States we can afford to pay, for the freedom from arbitrary police methods, the slight cost of an occasional unpunished offender. In Austria, the Military Commander would not find the bargain so desirable. The cost might be, not an unpunished criminal here and there, but an enemy of the occupation forces spreading his influence into receptive channels, feeding the discontent of the population, organizing resistance movements, and hampering the reconstruction of a friendly state and the restoration of freedoms so recently destroyed by the Nazi regime. In this setting, in an occupied country under Military Government, a search and seizure deemed necessary by the highest military commanders, ordered

by them to be conducted in the manner customarily employed by the military, with their orders relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable. Thus defendant's rights under the Fourth Amendment were not violated."

■ Appellant advances the further point that the trial judge erred in denying his motion, at the time the jury was being empaneled, to be allowed to inspect and use a report of the F.B.I. of its investigation of members of the venire. It appears that such a report was in the hands of the prosecution, but the U.S. Attorney denied that the F.B.I. had made personal contact with any juror in the course of the investigation, and the record contains no indication to the contrary. We know of no authority for the proposition that the accused in a criminal case has a peremptory right to inspect such a report; indeed the intimation of the cases is the other way. See Christoffel v. United States, App.D.C., 1948, 171 F.2d 1004, 1006, reversed on other grounds 1949, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826; Commonwealth v. McCann, 1950, 325 Mass. 510, 91 N.E.2d 214. Prospective jurors were extensively, and we think adequately, questioned by the trial judge in aid of the defendant's exercise of his right of challenge. It is pure speculation whether the report would have been of any additional assistance to the defense in this regard. There is no basis in the record for a suggestion that the jury was not impartial or that it did not fairly consider the issues presented to it. The record does show that the district judge exhibited from start to finish marked solicitude for protecting the rights of the accused. Assuming that it was within the discretion of the trial judge to permit inspection of the F.B.I. report, we cannot say that there was any abuse of discretion in denying the motion in this case.

Other minor contentions have been made. We have considered them, but have found no reversible error.

The judgment of the District Court is affirmed.

GOODRICH, Circuit Judge, concurring.

I concur in the judgment, and in the opinion of the Court, except that I do not wish to intimate any opinion as to the extraterritorial application of the Fourth Amendment.