Ralph E. SAYLOR

v.

The UNITED STATES.

No. 133–63.

United States Court of Claims.

March 17, 1967.

———◆———

Carl L. Shipley, Washington, D. C., for plaintiff; Shipley, Akerman & Pickett, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge.[*]

The plaintiff, a veteran entitled to the benefits of the Veterans' Preference Act of 1944, 58 Stat. 387, sues for back pay owing because of his alleged unlawful removal from his civil service position. After a tour of duty as an Army officer in Japan, he was released from the service and was employed in a civilian capacity by the Army in Japan. In 1955, he transferred to the Professional Entertainment Branch, Pacific Command, which was located at Camp Zama, Japan. In time, he was promoted to Director of the Branch at a grade 12 rating. Every two years or so, this activity and its employees rotated between the Army and the Air Force. Between December 2, 1957 and September 20, 1960 the Branch was part of the Air Force, reverting to the control of the Army on the latter date.

Because of a private complaint received by plaintiff's superiors, while he was with the Air Force or shortly thereafter, it was determined in the fall of 1960 that an investigation should be made of plaintiff's conduct of his position (especially his alleged favoring of the agents of certain entertainers). Since at that time the Air Force performed the investigation work for the entire Pacific Command, two Air Force special agents were assigned to plaintiff's case (although he was then under the Army). They filled in a mimeographed form, entitled "Authority to Search", which purportedly authorized them to search plaintiff's person, his automobiles, and his quarters, incident to their investigation into "Misconduct and/or Alleged Fraud", "and to seize any property pertinent to such investigation." The form was signed on November 30, 1960, by the Air Force colonel who was the Deputy Commander for Administration of the Air Force unit with cognizance of the investigation. Although the automobiles and the quarters were identified, there was no limitation of matters to be searched or seized, nor was there any description of the items sought. No sufficient probable cause was indicated to the colonel in any man-

---

[*] The court acknowledges the contribution of Commissioner William E. Day, substantial parts of whose opinion we have incorporated. We take the same view of the case as he did.

ner, and he did not make such a determination; there was no oath or affirmation given in connection with the execution of the document.[1]

On the next day, December 1, 1960, the special agents presented themselves at the office of the plaintiff's superior, Army Lt. Col. Fleischer, advising him of their mission. The colonel introduced the agents to the plaintiff at 8:30 or 9 o'clock that morning. They remained with the plaintiff until about 6 o'clock in the evening. The agents identified themselves and told him that he was under investigation for misconduct and/or alleged fraud. They read to him the Fifth Amendment of the Constitution, as well as Article 31(b) of the Uniform Code of Military Justice,[2] and advised him of his right to counsel. There was practically no interrogation of the plaintiff by the agents, who were interested, rather, in whatever might be turned up in a search of the plaintiff's office, home and automobiles, which might shed any light on any kind of wrongdoing by him in connection with his job. He was asked to sign a written consent to a search of his desk and private papers located in the Government office where he worked, and he did sign a writing consenting to this part of the search. The agents spent most of the morning going through the office, looking through both official files and private papers of the plaintiff, from his desk and briefcase. They extracted papers which filled two or three boxes and placed the boxes in the trunk of a Government car which was assigned to their use. The agents, although not questioning the plaintiff, accompanied him to the men's room and also to lunch. When plaintiff asked whether he was under arrest, he was answered in the negative.

---

1. The "Authority to Search" read as follows in full text:

"AUTHORITY TO SEARCH

Fuchu Air Station, APO 925
(Place)
30 November 1960
(Date)

"Authority is hereby granted to Special Agent(s) JOSEPH A. LARIVIERE, ELLSWORTH W. VIAU, Office of Special Investigations, to search, in the course of (their) investigation into Misconduct and/or Alleged Fraud with
(Nature of offense under investigation)
the necessary and proper assistance, (the person) the *the automobiles license #'s 3E6768, 3E6769 and quarters located at 117–D, Washington Heights, Tokyo,
(Exact Location)
Japan of Ralph E. Saylor, DAC Office of Special Services, Hq USARJ, APO
(Person being Searched)  (Organization and APO)
343 and to seize any property pertinent to such investigation.

Walter J. Wilson
(Signature)
WALTER J. WILSON
Colonel, 7238A, Dep Comdr for Admin
(Grade, Service No., Title)
Hq 6000th Support Wing, APO 925
(Organization and APO)

"* Insert dwelling, room, automobile, footlocker, etc., as applicable. Describe in detail the property to be searched where necessary for proper identification."

---

2. "No person subject to this code may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial." 10 U.S.C. § 831 (1964).

Saylor's quarters were located in a military compound called Washington Heights, near the center of Tokyo. When the search of the office was completed, the agents told him that they were going on a trip to Washington Heights, and he was told that it would be beneficial if he would accompany them. He did so. After stopping on the way at the Army Provost Marshal's office, the agents, with the plaintiff in the rear seat of the automobile, proceeded to his home, where he was told that they intended to search the home. He was shown the general "Authority to Search", and the search proceeded. He did not consent to the search of his home or of the automobiles.

The agents made a very thorough search of plaintiff's home, opening and examining the contents of bureau drawers, jewelry cases, closets, and suitcases. They took a pile of papers and documents, about three or four inches in bulk. They then went to the automobiles, parked at the home, and searched them, taking some additional documents. There was no segregation of the documents taken from the office, from the home, or from the automobiles. All were mixed together.

Entirely on the basis of the contents of letters and other documents seized by the special agents, the plaintiff was charged, in April 1961, with engaging in business and professional activities and interests which resulted in a conflict of interest with his official duties in connection with the Government's entertainment program in the Pacific area, as well as with violating an Army regulation forbidding the carrying on of commercial enterprise without prior official approval. His removal was proposed.

After replying to the charges contained in this advance notice of removal, the plaintiff received a determination that, upon consideration of the charges and his reply, it had been found that the charges were sustained and that he would be dismissed on a day certain. (The date of removal was ultimately extended until all appeal procedures had been exhausted.)

The plaintiff requested a grievance hearing. This was allowed and a 4-day hearing was conducted by a grievance committee. The plaintiff appeared personally and by counsel. At the commencement of the hearing, he was asked whether he had seen each letter excerpted in the letter of charges. He answered affirmatively. The chairman of the grievance committee then asked whether there was any objection to the use of such letters as exhibits, and there was no objection. Previously the chairman had read from certain civilian personnel regulations, dealing primarily with the function of the grievance committee, and the procedures to be followed during the hearing. In this connection, the chairman said, among other things, that "legal rules of evidence used in courts of law will not be observed", and that the hearing was not being held for the purpose of completely developing the case but rather "as a means for assembling additional information or testimony to supplement an existing record."

The grievance committee recommended that the removal action be sustained, and the Commanding General, United States Army, Japan, informed plaintiff that the testimony and evidence warranted his dismissal. The plaintiff then appealed to the Commander in Chief, United States Army, Pacific, and for the first time stated a detailed objection to the manner in which the search of his home and automobiles had been conducted, pointing out that all the evidence upon which his removal was sought stemmed from the unlawful "raid and impounding of the employee's personal papers." The Commander in Chief, United States Army, Pacific, denied the appeal, and further appeals were taken up through the Board of Appeals and Review of the Civil Service Commission.

If the evidence supporting the charges was lawfully seized and used in the removal proceedings, it was adequate to sustain the plaintiff's dismissal. There are, however, two problems in the case. The principal one is whether the taking and use of this evidence violated plain-

tiff's constitutional rights under the Fourth Amendment to be secure in his home and property against unreasonable searches and seizures.[3] The procedural question is whether plaintiff has waived his privilege to present that constitutional issue to us.

■ There can be no doubt that, if this were a wholly civilian case arising in this country, the search and seizure here would be invalid and the dismissal unlawful. Almost every proscription of the Fourth Amendment would have been violated. The search and seizure were not connected with an arrest, and would therefore have required a warrant. If the standard-form "Authority to Search" (footnote 1, supra) be equated to a warrant, there would be several vital defects. The colonel who signed it, the Deputy Commander for Administration, was not an impartial magistrate or the equivalent of one. No showing of probable cause was made to him, and there was no oath or affirmation by the special agents or anyone else. The colonel made no finding of probable cause, and, so far as the record reveals, there was, in fact, no probable cause for a search. The evidence, either in the administrative proceedings or before this court, does not suggest that, prior to the search, anyone had reason to believe that any particular document, or any relevant documents at all, might be expected to be found in the plaintiff's quarters or automobiles. In addition, the "Authority to Search" was totally without limit and did not describe the things to be seized; it specifically permitted the seizure of "any property pertinent to [the agents'] investigation." This made it, in effect, a general warrant which has been forbidden in Anglo-American law for two centuries. Stanford v. State of Texas, 379 U.S. 476, 85 S.Ct.

506, 13 L.Ed.2d 431 (1965); Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The actual search, itself, would also have to be classed as general, nosing for whatever might turn up. Plaintiff's home and automobiles were exhaustively gone into, not to find described items, but to see what was there. Cf. Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957); Powell v. Zuckert, 366 F.2d 634 (C.A.D.C. 1966).

■ In a wholly civilian case within the United States, the fruits of such a search and seizure could certainly not be used as the foundation for the discharge of a federal employee entitled to veterans' preference. For "when Section 14 of the Veterans' Preference Act, 5 U.S.C. § 863, refers to 'evidence submitted' in employee discharge proceedings, it means evidence submitted without violating the Constitution of the United States. * * * It would seem wholly at odds with our traditions to allow the admission of evidence illegally seized by Government agents in discharge proceedings * * *." Powell v. Zuckert, supra, 366 F.2d at 640. The guarantees of the Fourth Amendment are fundamental to our system (Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)), and the Supreme Court has held the exclusionary rule essential to their enforcement. Mapp v. Ohio, supra.

■ The Government's defense is that this is not a civilian case within the United States, but a suit with dominant military overtones arising abroad at the equivalent of an American military base. It is said, first, that the Uniform Code of Military Justice and the Manual for Courts-Martial authorized the search,[4]

3. It is not asserted that the search of the plaintiff's desk in his Government office violated his constitutional rights. He signed a consent to such a search. However, since the papers removed from the desk could not be separately identified from those which were taken from the quarters and the automobiles, all of the documents seized from all places must be

considered as having come from the home and automobiles.

4. The defendant cites the portion of the Manual which provides (Manual for Courts-Martial, United States, 1951, ¶ 152, pp. 288–89): "The following searches are among those which are lawful: * * * A search of property which

and that plaintiff, as an overseas civilian employee of the military, was subject to the Code and the Manual. But whatever may be the search-and-seizure rules for persons who are subject to military justice, neither the Code nor the Manual prescribes any rules for civilian employees. The Supreme Court has put that beyond litigable controversy. In McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed. 2d 282 (1960), and Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960), the Court expressly invalidated Article 2(11) of the Uniform Code, 10 U.S.C. § 802—the provision placing under the Code "persons serving with [or] employed by * * * the armed forces outside the United States" (with irrelevant exceptions).[5] It was held, not merely that civilian employees are free of court-martial trials, but that they are not subject to the Uniform Code because the constitutional power (Art. I, § 8, cl. 14) "To make Rules for the Government and Regulations of the land and naval Forces"—the basis for that Code—does not encompass civilians employed by or accompanying the military abroad (at least in peacetime). See 361 U.S. at 242–243, 246–248, 283–284, 286, 80 S.Ct. 305. In this respect, the Court in 1960 followed Mr. Justice Black's opinion in Reid v. Covert, supra, 354 U.S. at 19 ff, 77 S.Ct. 1222. The necessary conclusion is

that the Code and its implementing Manual cannot be used to sustain the search and seizure in this civilian employee's case.[6]

█ It is then said that, apart from the Code, under immemorial custom a military commander has virtually unlimited authority to authorize searches on a military station or ship of war, and that he must possess that power for the safety and discipline of his command and his subordinates. See United States v. Grisby, 335 F.2d 652, 654–655 (C.A.4, 1964); Richardson v. Zuppann, 81 F. Supp. 809, 813 (M.D.Pa.1949), aff'd per curiam, 174 F.2d 829 (C.A.3, 1949). We can avoid the hypothetical question of the full extent of this power in any and all situations because we are satisfied that, in the particular circumstances of this case, the military commander could not authorize the search or the seizure which were made. It is important, in judging the commander's authority in the concrete setting, to weigh both the public and the private interests at stake. Cf. Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). On that scale, as we now point out, the search and the seizure are clearly marked as unreasonable.

The possible allegations against plaintiff, implicit in the private complaint

is owned or controlled by the United States and is under the control of an Armed Force, or of property which is located within a military installation or in a foreign country or in occupied territory and is owned, used, or occupied by persons subject to the military law or to the law of war, which search has been authorized by a Commanding Officer (including an Officer in Charge) having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to the military law or to the law of war in the place where the property is situated. The Commanding Officer may delegate the general authority to order searches to persons of his command. This example of authorized searches is not intended to preclude the legality of searches made by military personnel in the areas outlined above

when made in accordance with military custom."

5. Earlier, the Court had voided Article 2(11) insofar as it related to civilian dependents of servicemen charged with capital crimes. Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). In Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), the Court extended that holding to non-capital cases. Under the Court's decisions in 1957 and 1960, the Code is inapplicable to any civilian serving with, employed by, or accompanying the military abroad in peacetime.

6. *Guagliardo, Grisham,* and *Singleton* were all decided by the Supreme Court on January 18, 1960. The search of plaintiff's home and automobiles occurred some eleven months later, on December 1, 1960.

against him and the then current rumors, involved fraud and conflict-of-interest in carrying on his job of helping to provide entertainment for the troops—not violence, the security or safety of the command, the discipline of servicemen, subversion, or even the theft or embezzlement of federal funds. So far as we can tell, there was no need for an immediate search to prevent use or disposition of weapons, or the instruments or fruits of a crime. There was, in other words, no emergency; as a matter of fact, the military waited some time (apparently a month or two) after receiving the private complaint before executing the search. There is no showing, moreover, of any other need for a general and unlimited authority to search such as this, or for one unsupported by any probable cause, or for the thorough but unparticularized search that was actually made. So far as we are aware, the Air Force special agents did not first undertake to probe into the allegations by interviewing persons who might have some knowledge of the facts, or otherwise undertake to acquire some reason to believe a search for specific items was necessary.

■ In appraising the reasonableness of this search it is also significant that the plaintiff was a civilian and not generally amenable to military jurisdiction and discipline. This separate status meant that he could not be automatically treated as if he were a soldier. To make the search of a civilian's home and property reasonable, more of a showing may be required and more protections afforded, to the extent that conditions warrant. In this instance there was not the slightest effort in this direction, even though the extreme latitude allowed the investigators was neither necessary nor desirable. None of the safeguards traditionally surrounding American searches and seizures was utilized (except for the superfluous identification of the plaintiff's residence and automobiles). On their own initiative the agents were handed, and used, an unconfined roving commission.

■ Of course, Saylor's home was located in Washington Heights, a residential compound under the control of the American military, but the civilians (at the least) living there were entitled under the Fourth Amendment to some security "in their persons, houses, papers, and effects." See Reid v. Covert, supra, 354 U.S. at 5–14, 77 S.Ct. 1222 (opinion of Mr. Justice Black); Powell v. Zuckert, supra, 366 F.2d at 640.[7] However one characterizes the technical status of the ground on which it stood, the place was Saylor's private home and the community a residential one. In the absence of any showing of need for the undefined and unlimited general inquiry authorized and made, there is no more reason to uphold this search and seizure than there was to sustain the general search of another civilian employee's home "at an off-base private dwelling" (in Japan) which was invalidated in the comparable case of *Powell,* supra. Even though we may assume that the commander could—in other, more pressing, circumstances—authorize a general search of this character, there was here far less than minimal justification.

■ No judicial decision supports the lawfulness of this search and seizure. In Best v. United States, supra, 184 F.2d at 138–141 (C.A.1, 1950), cert. denied, 340 U.S. 939, 71 S.Ct. 480 (1951), Judge Magruder took pains to disavow the notion that the Fourth Amendment does not extend to civilian Americans in foreign countries occupied by our armed forces,[8] and upheld the Army's warrant-

---

7. These cases, and others, show that we have passed beyond the argument that the Fourth Amendment has no application at all overseas. See, also, Best v. United States, 184 F.2d 131, 138 (C.A.1, 1950), cert denied, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951); United States

v. Grisby, supra, 335 F.2d 652, 656 (C.A. 4, 1964).

8. The opinion said (184 F.2d at 138): "For example, suppose A, a citizen of the United States, goes to Germany to take employment in a civilian capacity under the High Commissioner [for occu-

less search of the traitor Best's Viennese apartment only after concluding that it was reasonable "in the particular setting"—a setting poles apart from that before us. In Grewe v. France, 75 F. Supp. 433, 434, 437 (E.D.Wis.1948), involving a civilian employee of the Army in Germany in June 1946, the court also stressed the emergent circumstances (again far different from ours) and evaluated the particular search as reasonable. Richardson v. Zuppann, supra, 81 F.Supp. 809, 811, 813, aff'd per curiam, 174 F.2d 829, concerned a serviceman not a civilian (see 81 F.Supp. at 810), and the judge applied the law customary for members of the military establishment who are subject to military law. Similarly, in United States v. Grisby, supra, 335 F.2d 652, the defendant was a Marine corporal, convicted by a District Court on evidence seized pursuant to a search of his quarters on a military reservation, without a warrant, ordered by military superiors on the basis of probable cause. The two significant features which distinguish *Grisby* are that that accused was a military man, clearly subject to military law, and that the search was authorized after a finding of probable cause. The court particularly emphasized the latter factor (335 F.2d at 655).[9] These cases, proffered by defendant, are all inapposite. Almost precisely in point is Powell v. Zuckert, supra, a discharge case in which the District of Columbia Circuit recently voided a general search and seizure of a civilian employee's residence in Japan

(citing Commissioner Day's opinion in the present case).

■ The only remaining hurdle to a judgment of recovery is the defense that plaintiff waived his right under the Fourth Amendment to be free of evidence unlawfully seized. As earlier indicated, the plaintiff, represented by counsel at the grievance board hearing, did not object to the use of the seized documents, though given that opportunity at the beginning of the hearing by a considerate and thoughful chairman. Did he, by his failure to so object, waive his right to the fundamental protection of the constitutional guarantee? We are of the view that he did not. The grievance proceeding was informal, and legal rules of evidence would not be observed. The indications were that materials already in the file would in any event be considered, and that the hearing served "primarily as a means for assembling additional information or testimony to supplement an existing record." Excerpts from the seized documents had already appeared in the letter of charges, and it may well be that plaintiff and his counsel thought that those excerpts would necessarily remain part of the record even though plaintiff objected to other parts of the same documents or to other documents. At any rate there was no discussion at the hearing of the plaintiff's rights under the Fourth Amendment or of the bearing of the circumstances of the search and seizure on his right to have the documents excluded from all consideration. There appears to have been nei-

---

pied Germany]. He is suspected of having previously transported stolen goods in interstate commerce, in violation of 18 U.S.C.A. § 2314. Agents of the F.B.I., without any search warrant, break into A's dwelling in Germany, ransack the place, find and seize the alleged stolen goods. Upon a subsequent prosecution of A in the United States for that offense, it can hardly be doubted that the evidence so obtained would be excluded as the product of a search and seizure forbidden by the Fourth Amendment. And this would be so, even though no judicial officer had been authorized to issue a warrant for a search in occupied Germany."

9. The Government cites the Fourth Circuit's observation that "in some contexts [the military] must and does have authority to conduct searches without probable cause" (335 F.2d at 655), but it is obvious that the court was not saying either that (i) in *no* instance would probable cause be necessary (the opinion suggests the opposite a few lines previously), or (ii) the same standards apply to civilians as to servicemen (the whole opinion dealt only with the rights of the latter).

ther a conscious or informed waiver nor a deliberate tactical choice to by-pass the Fourth Amendment issue. In these circumstances, a constitutional right of the greatest magnitude, so directly related to the heart of the case against plaintiff, should not be held to be waived by the ambiguous action of failing to object at the grievance hearing—especially since the point was later made and preserved before administrative review was completed within the employing agency. Cf. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); White v. State of Maryland, 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Henry v. State of Mississippi, 379 U.S. 443, 448 ff, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); Miranda v. State of Arizona, 384 U.S. 436, 475, 495, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ The plaintiff has objected, at every stage subsequent to the grievance board hearing, to the use of the seized documents. He made the point explicitly in his appeal to the Commander-in-Chief, United States Army, Pacific, from the decision of the Commanding General, United States Army, Japan (which followed the grievance board's recommendation). In then seeking review at the first level within the Civil Service Commission, plaintiff was not as explicit, but his letter of appeal referred, at the outset, to his detailed presentation within the employing agency and to "the full contents of his appeals within the Agency's grievance procedure", and added: "These documents set forth in detail the objections and the grounds therefor which the Employee registered at each stage of the removal action. Each and every objection has been completely ignored to date. In fairness to the Employee it is requested [that] they be read carefully. We believe you will agree that never has one removal action been so completely discredited by procedural and substantive violations." [10] This was sufficient to raise the point before the Commission. Powell v. Zuckert, supra, 366 F.2d at 641.[11] The issue was preserved on appeal to the Board of Appeals and Review, whose decision noted that "You [plaintiff's counsel] also contend that the employing agency violated Mr. Saylor's constitutional rights by an unlawful search and seizure of his files and using such information as evidence to support the charges." The Board's answer was: "You are advised that the issue of whether or not the agency's impounding of the records violated Mr. Saylor's constitutional rights is not properly for consideration by this Board." The reason for this abstention is unclear.[12] What is

10. The letter of appeal then specified various points (not including the Fourth Amendment violation) as "additional matters" "in addition to all of the foregoing grounds for this appeal."

11. Defendant's strongest argument (on this aspect of the case) is that, if the Fourth Amendment question had been presented to the grievance board, management might have been able to separate out of the documents taken from the office (see footnote 3, supra), and then base its action solely upon those materials. There is no reason to believe that this could any longer be done at the time of the grievance hearing which was held more than six months after the search; the jumbling of the papers had occurred at the time of the search. In any event the Civil Service Commission's hearing was *de novo*, under Section 14 of the Veterans' Preference Act, and the Commission could have performed the same task of separation (with the help of the Army and Air Force) if it was ever possible to do so. The Army and the Air Force were alerted to the point by plaintiff's prior appeal to the Commander-in-Chief, United States Army, Pacific.

12. The Board of Appeals and Review may possibly have meant that its jurisdiction was restricted to violations of the Veterans' Preference Act, of the Commission's regulations, and of the agency's own regulations, but would not encompass violations of constitutional rights. Such a ruling would have been erroneous since, as pointed out above, the Veterans' Preference Act implicitly excludes the use of evidence illegally seized. If the Board meant that it could not consider the point because the regional office's written de-

plain is that the argument was made before the Commission, as it has been in this court.

The Government's case falls with the exclusion of the seized documents since the removal was admittedly based entirely on those papers. The plaintiff is therefore entitled to recover his back pay, less appropriate offsets, and judgment will be entered to that effect. The amount of recovery will be determined under Rule 47(c).

NICHOLS, Judge (concurring).

Our commissioner started with the holding, with which I agree, that the Constitution did not protect the plaintiff against unreasonable, or any, search of his desk by his employer. The desk was owned by the employer and was in the office assigned to plaintiff by the employer on the employer's premises.

Not much is said about the Cadillac car which was also searched. If it had been an official car, owned by the Government and assigned to plaintiff to facilitate performance of his duties, I do not think it would have been immune from even a "fishing expedition" search. But no doubt it was personal. I take judicial notice they do not normally assign official Cadillacs to persons in plaintiff's grade. I agree that the Constitution protects personally owned Cadillacs against unreasonable search.

The search of plaintiff's living quarters seems to be viewed as the gravest breach of his Constitutional rights. The court says they were to all intents his "private home." Yet, like the desk and the hypothetical official car, it was owned by the employer, it was on the employer's premises, and was assigned to the plaintiff to facilitate performance of his official duties. Moreover, it was located on a military post in a foreign country, guarded as such by United States troops. Now, we know every man's home is his castle, be it a "company house," a rented house, or even a hotel room. But can you have a castle in the sovereign's castle? I would say you might if the sovereign let you do so, but his manifested intent to the contrary ought to be respected and would not rise to the dignity of a Constitutional deprivation.

The sovereign's intent as published here was applicable only on the erroneous assumption that plaintiff was subject to military law, in which case it would have been clear he had no castle within the castle. With respect to plaintiff's true status as we now know it, the sovereign's intent is not at all clear and I see nothing defendant refers us to that establishes a decision by the military authority to exercise unlimited search rights in that compound, as to persons not subject to military law.

We are, I think, making new law whatever we do. I do not find the opinions that have been cited to us to be at all in point for the peculiar issue here involved. When the search was made on the post, in all those cases a person supposed subject to military law was involved, and *Powell,* supra, which will surely become a leading case, involved one not subject to military law, to be sure, but his quarters, which were searched, were not on any post. Our case ought not to be deemed "almost on all fours" with the *Powell* case, supra, as the Court of Appeals stated on reading our commissioner's report, at 366 F.2d 640, and as the majority state herein. It differs in a very essential respect.

The record herein does not tell me enough about the nature of plaintiff's tenure of his assigned quarters to show whether it was analogous to the desk and the hypothetical official car. I am sure the post commander believed he had the power to send his representative anywhere on the post, but there is no showing here that the persons who conducted the search, the "special agents," did so on behalf of or under authority of the post commander. This in my view would be at least essential if their action were

---

cision did not advert to it, that, too, would have been wrong since (as shown above) the plaintiff raised the issue before the regional office and was entitled to a resolution.

to be sustained, so far as the right to search would have to depend on inherent powers of the post commander. The level of command which generated the orders to the special agents is not shown to have had authority over the post and the agents, on the post, could have been mere invaders for anything Justice has told us. In the *Best* case, supra, discussed in the majority opinion, the chain of authority from the highest levels and the military regularity proved to have been observed were major factors in persuading the court that the military search of Best's civilian apartment was lawful.

Our decision ought to be restricted to this case and not make any sweeping statements that might derogate from the power of the sovereign, if it so desired, to delegate full and plenary power to the commander of its castle to search all and every part of it at his election, without review or second guessing by anybody or tribunal whatever.

The Government in oral argument intimated that the powers of the commander of a United States military contingent in a foreign country are inherently those of the captain of a ship at sea or a plane in the air. I think they ought to be no less, but the Government brief is disappointing in not furnishing legal support for the idea or applying it to the case at hand. For example, would the Constitution or law allow the captain of a ship at sea to search a passenger's stateroom without probable cause?

This case, the *Powell* case, supra, and others discussed in the majority opinion, are not going to make military commanders overseas happy with their lot. They do not mind if their powers are specifically curtailed. Then, the authority which imposed the curtailment is responsible if something is prevented from being done that needs doing. But, we judges tell them they must not authorize an unreasonable search, yet that no one can pronounce a formula of what is reasonable, so they will have to guess the reaction of a civilian court thousands of miles and many years away, out of all touch with the urgency of the situation.

I, for one, would not blame them if they said this was another illustration of the irresistible urge driving civilian courts to meddle in business they do not understand.

The commissioner found that the papers legally seized from the desk were commingled with those illegally seized from the quarters and the car, so he could not tell which was which and therefore he had to regard the whole as illegally seized. I do not know whether that argument would be still valid if only the car search were deemed illegal.

The case troubles me but I am prepared to concur in the result on the basis of clearly unreasonable search and seizure with respect to the papers from the car, and with respect to the quarters, that no authority to search military quarters other than of persons subject to military law, was shown to have been delegated from the highest levels to those who made the search, nor was the search shown to have been predicated on inherent powers of the post commander, if such there be, and therefore the Government fails to justify the search in that case too. Finding of Fact No. 24 is acceptable to me on that basis but, parenthetically, I am at a loss to understand why this is a finding of fact and not a ruling of law.