**Reverend Gene BRIDGES et al.,
Appellants,**

v.

**Admiral D. C. DAVIS et al., Appellees.**

**Reverend Gene BRIDGES et al.,
Appellants,**

v.

**Colonel D. McGOUGH et al., Appellees.**

**No. 25317.**

United States Court of Appeals,
Ninth Circuit.

June 18, 1971.

Rehearing Denied Aug. 27, 1971.

See 445 F.2d 1401.

Koelsch, C. J., dissented in part in an opinion.

Edward R. Bendet (argued), Honolulu, Hawaii, John S. Edmunds, Brook Hart, ACLU, Honolulu, Hawaii, for appellants.

Alan Rosenthal (argued), Robert V. Zener, Raymond D. Battocchi, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., William D. Ruckelhaus, Asst. Atty. Gen., Washington, D. C., Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for appellees.

Before KOELSCH, CARTER and KILKENNY, Circuit Judges.

PER CURIAM:

This is an appeal by three ordained ministers (Bridges, Jones and Warner) and eight servicemen from a decree, 311 F.Supp. 935, dismissing their actions for injunctions against certain military authorities in Hawaii.

FACTUAL BACKGROUND

In August, 1969, the Church of the Crossroads and the Unitarian Church in Honolulu became sanctuaries for military servicemen who decided to absent themselves without leave. The appellant ministers were involved in the sanctuaries. The other appellants are servicemen who entered the sanctuaries while absent without leave from the military. After the servicemen were arrested and placed in military prison, the ministers performed services for them on the military base. Subsequently, the appellee commanding officers of Naval and Marine bases in Hawaii barred the ministers from again entering those bases on the ground that their presence would be inimical to morale and good order of the service.

The facts are practically undisputed. Hawaii is an important American staging area for military activities in the Pacific. There located are the Pearl Harbor Naval Base (Pearl Harbor) and the Marine Corps Air Station, Kaneohe Bay, Hawaii (Kaneohe), each of which contribute significantly to the nation's military effort. Pearl Harbor is under the command of appellee, Rear Admiral D. C. Davis, Commandant of the 14th Naval District, and Kaneohe is under the command of Colonel James D. McGough.

The Naval regulations applicable to officers in command of naval activities direct the commander to exert every effort to maintain his command in a state of maximum effectiveness. They instruct the commanding officer to take all necessary and proper measures to promote and safeguard the morale, the physical well being and the general welfare of the officers and enlisted men under his command. Appellant servicemen, when in the sanctuaries, were defying the military authorities and could well be classified as deserters. (One who harbors, conceals, protects or assists any deserter, knowing him to have deserted or refuses to give up and deliver such person on the demand of an officer authorized to receive him, violates the law.)[1]

As early as August, 1969, appellant Warner opened the doors of the Church of the Crossroads to servicemen who were AWOL. This was in protest to the war in Vietnam. He was designated as the "spiritual leader" of the Crossroads sanctuary. On that date, the first servicemen entered the sanctuary. Four days later the servicemen and Warner acted as leaders of a group of 350 people who marched under the name of the "Hawaii Resistance." During the course of the march, Warner called on observing servicemen to join the movement, and urged participants to "resist" any attempt by civilian or military authorities to arrest the servicemen who joined the march. Six other servicemen, including two of the appellants, declared

---

1. 10 U.S.C. § 866, 10 U.S.C. § 895 and 18 U.S.C. § 1381.

themselves AWOL and entered the Crossroads sanctuary immediately following the march. Warner then issued a statement, published in the newspaper, that approximately 20 persons would barricade themselves in the sanctuary and protect the servicemen fugitives from arrest. On August 17, 1969, Warner published an article in a newspaper in which it was stated that the initial servicemen to enter the sanctuary, "openly defied arrest" in the August 10th march, and that the total number of servicemen in the sanctuary had reached 15. The article compared the delightful living conditions and activities in the sanctuary to the drab life in the military. A short time later, the number of military fugitives in the sanctuary reached 24. On that date, three of the number moved to the First Unitarian Church of Honolulu, whose minister, appellant Bridges, had decided to open the church as a sanctuary. Bridges, who is also an attorney, prepared a document to be signed by those who might be apprehended, which indicated that Bridges, or some other minister whom he might designate, should have immediate and prompt access to them in any place where they might be confined.

In early September, 1969, Armed Service policemen entered the church sanctuaries and arrested 12 fugitives who were AWOL. Eight of those are appellants. Thirteen others escaped.

During all this period, Admiral Davis was receiving intelligence reports, briefings from staff members, watching television reports, and reading the articles in the newspapers. He hesitated to bar the ministers from the base because " * * * we were trying to be as open-minded as possible and not create a situation if we [could] avoid it." On September 15th, Warner conducted a service for about nine prisoners in the prison brig. Although he knew that the consumption of wine was forbidden, Warner permitted a full bottle of wine to be passed among the prisoners, each of whom drank from it. He also passed out pieces of birthday cake to the prisoners. Certain of his remarks were in derogation of the military.

Immediately following this service, Admiral Davis reached the conclusion that Warner's overall conduct, both on and off the base, was detrimental to the good order and discipline of the service and was prepared to bar him from the base. When Bridges learned of this, he implored the Admiral not to take such action. The Admiral refrained on the promise of Bridges to accept "certain areas of responsibility". Bridges, by letter, asked that he be permitted to give religious counselling and conduct services for prisoners who listed their religious preference as Unitarian. In this letter, he named appellant Jones as an alternate. Jones is a minister of the United Church of Christ and was actively involved in the Crossroads sanctuary activity. In the letter, Bridges also indicated that Warner and Jones would be acting under his supervision. Bridges was then informed by letter that times would be made available to the three ministers for conducting services and counselling prisoners. The following day, Bridges held a service in the prison chapel for six prisoners. Although he had been informed by the military authorities of their concern with Warner's lack of ministerial attire when on the base, Bridges conducted the service in a short sleeved shirt and trousers. During the course of the sermon, he quoted from a song which used a four letter word. He also lit a cigarette, and permitted the prisoners to do likewise. Smoking is not permitted in the prison chapel.

One of the soldiers who escorted the prisoners to the chapel was so upset by the service that he indicated to commanding officers he would disobey an order to again perform church duties if the services involved these prisoners. The following day another marine reacted to reports of the service by assaulting one of the participants. Many reports reached the Admiral indicating that the service had a disturbing effect

on the entire military community. Thereupon, he concluded that the continued presence on the base of the three ministers would have an adverse effect on the morale at the base. It was his belief that the actions of the AWOL servicemen in seeking sanctuary in the ministers' churches and in defying military authority went to the very heart of discipline and morale. Although he felt there was enough justification to bar the ministers prior to the September 25th affair, he said that the service conducted by Bridges, the designated leader of the group, on that date was "just the last straw". He then issued the order barring the three ministers from the base.

Colonel McGough, the Commanding Officer at Kaneohe Marine Corps Air Station, was fully aware of the activity at the sanctuary but, even so, permitted Warner to visit a prisoner. The Colonel was also aware of the involvement in sanctuary activities of Bridges and Jones. Subsequent to his receipt of reliable information on the chapel incidents of September 15th and 25th and an incident at Pearl Harbor Correctional Center, he concluded to bar the three ministers from the area over which he had jurisdiction. A further discussion of the elaborate evidence presented to the trial judge would add nothing to the validity of our conclusions.

### ISSUES

While appellants assign a variety of reasons for reversal of the judgment of the trial court, we hold that two principal questions are involved: (1) are the orders in question reviewable, and (2) if reviewable, is this court permitted to substitute its judgment for that of the military authorities as to the necessity for the orders in question?

■ (1) Following the decision in Orloff v. Willoughby, 345 U.S. 83, 73 S. Ct. 534, 97 L.Ed. 842 (1953), many courts seemed to confuse jurisdiction with scope of review. However, to say that an action is non-reviewable is not the equivalent of saying that the appropriate court lacks jurisdiction to review. Although the scope of review in cases such as this involving military matters is extremely limited, that does not mean that any military action is beyond the reach of the courts. Smith v. Resor, 406 F.2d 141, 145 (2d Cir. 1969). Therefore, in a strict sense, the orders before us are not non-reviewable. The phrase non-reviewability is properly ascribed to the scope of review, rather than jurisdiction to review. The *Orloff* case supports this view.

■■ (2) The appellants claim that the orders here under scrutiny violate their freedoms of speech and religion under the First Amendment. Initially, we note that these rights are not absolute. Regulation as to the time, place, and manner of such rights is proper when reasonably related to a valid public interest. Sellers v. Regents of the University of California, 432 F.2d 493, 499 (9th Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971). The record before us leaves no doubt but that the orders in question could be justified in terms of a reasonable regulation of First Amendment activity. While the evidence implicating the appellant Jones may be somewhat thin, we hold it to be sufficient.

■■ Moreover, persons in command of a military post, such as appellees, have wide discretion as to whom they may exclude from their posts. This discretion will be disturbed only upon a showing that the grounds for exclusion were patently arbitrary or discriminatory. Cafeteria & Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). True enough, *Cafeteria Workers* involved a restaurant worker on the base, rather than a minister. However, we can find no valid reason why the logic employed in *Cafeteria Workers* should not be applied to the facts before us. In the totality of circumstances presented by this record, it cannot be said that the actions of appellees, in excluding appellant min-

isters from the respective posts, were patently arbitrary or discriminatory. *Cafeteria Workers* makes it clear that access to a military reservation is a matter within the sound discretion of the commander of the post. Any review of this discretion, other than to determine whether the action was patently arbitrary or discriminatory, is precluded by the logic of both *Cafeteria Workers* and *Orloff*.

We are not here concerned with Sixth Amendment rights and express no view as to the result if those rights were involved.

Appellees' motion to dismiss on the ground that the appeals are moot is denied. The judgment of the lower court, in each case, is Affirmed.

## CONCURRING AND DISSENTING

KOELSCH, Circuit Judge.

I concur in the result with respect to appellants Warner and Bridges, but I cannot join in affirming the judgment against Jones.

And, if substantial proof of actual misconduct was a necessary predicate for the post commanders' orders summarily barring Warner and Bridges from the military bases, then I would wholly disagree with my brothers. Unlike them, I do not believe that on this record we can attribute to Warner and Bridges many of the misdeeds and much of the mischief so forcibly emphasized by the opinion. The "proof" on that score consisted largely of hearsay, surmise and conclusory statements completely bereft of factual predicates.

But, as I read *Cafeteria Workers*, [Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)] judicial interference with a military commander's orders involving the exercise of discretion is largely confined to those rare instances where such orders are utterly incapable of being rationalized on any conceivably valid basis. The orders in the instant case, even though the result of gossip and unconfirmed rumor and although they extend to "men of the cloth" are not, in my opinion, within that category.