**UNITED STATES of America**

v.

**Dennis A. BURROW et al.**

**Crim. No. HM75–0302.**

United States District Court,
D. Maryland.

June 12, 1975.

24. PX 90c, p. 365.

Jervis S. Finney, U. S. Atty., for the District of Maryland, and Herbert Better, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Andrew Jay Graham, Baltimore, Md., for defendant Burrow; Michael E. Marr, and Phillip M. Sutley, Baltimore, Md., for defendant Sherman; and Michael S. Frisch, Asst. Federal Public Defender, Baltimore, Md., for defendant Fisher.

HERBERT F. MURRAY, District Judge.

Defendants are charged in a four-count indictment with conspiracy to distribute cocaine, LSD and marijuana and possession with intent to distribute cocaine, LSD and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 2.

The matter is presently before the Court on the motions of defendants Sherman and Fisher to suppress any and all tangible evidence seized from their persons and the vehicle which they occupied at the time of their arrest. The basis for their joint motion is that the search and seizure was performed without a warrant in violation of the Fourth Amendment, and that such search was conducted without probable cause, without consent and in the absence of any exigent circumstances which might serve as a legal basis for a warrantless search.

*Facts*

At approximately 6:15 p. m. on April 1, 1975, at Fort Meade, Maryland, military policemen John Watson and Kenneth Rath, while on routine foot patrol in the area of a post sports auditorium known as Murphy Field House, observed a blue van bearing Michigan license plates, in the parking lot directly behind the post field house. Earlier the military police had received a request by the Department of Motor Vehicles to be on the look-out for a vehicle bearing Michigan plates.[1] Rath observed that the van did not have a post registration sticker. Both military policemen approached the van. Rath, dressed in his military uniform bearing an "MP" designation, passed in front of the vehicle and was seen by the driver. He went to the passenger side of the vehicle while Watson approached the driver. Rath testified that upon reaching the passenger's side, he detected a weak scent of burned marijuana coming from the van and observed a brass smoking pipe in the partially opened ash tray. From his train-

---

1. Both military policemen testified that the defendants' vehicle was not the one being sought after by the Department of Motor Vehicles. This was learned when they ran the tag number of the defendants' vehicle through an NCIC computer check.

ing and experience [2] he recognized the brass pipe as being the type of instrument used to smoke marijuana. P.F.C. Watson, who had assumed his duties as a military policeman the previous month, also noted an odor of burned marijuana coming from the van as he approached; he characterized the intensity of the odor as being "moderate."[3] As to the individuals inside the van, according to the testimony of both M.P.s, the driver was holding a map, the occupant of the front passenger seat was described as being drowsy or sleepy, and the third individual was lying on the back seat asleep.[4] In response to an inquiry by Watson as to whether everything was all right, the driver responded that they had come to see a friend in the 76th Engineers.[5]

The two military policemen then withdrew from the van to the area of Murphy Field House where they radioed for a backup unit. In approximately five to ten minutes another two-man foot patrol unit and the duty officer, Staff Sergeant O. B. Andrews, arrived. The five-man military team then approached the van, instructed the occupants to get out of the vehicle, and placed them under "apprehension" (the military term for arrest). After the defendants had alighted from the vehicle, P.F.C. Watson, without entering the van, made a visual observation of its interior through the window and a door that had been left open. He observed incense, some cigarette rolling paper and an eighth of an inch residue of a burned marijuana cigarette ("roach") on the front floor of the passenger side of the vehicle.

After defendants were properly advised of their rights and their persons searched for weapons, Rath requested of the driver, defendant Dennis A. Burrow, permission to search the van, which he refused. Rath then requested that Burrow secure the vehicle; Burrow responded that this couldn't be done. A guard was left with the vehicle and the defendants were then transported to the Provost Marshal's office.

Because of the observations made in connection with the apprehension, Sgt. Andrews then called Colonel Clyde H. Patterson, Jr., the Post Commander, in order to obtain the latter's permission to search the vehicle. Patterson in turn contacted Lieutenant Colonel Jack Marden, the Staff Judge Advocate, and relayed the information he had obtained from Andrews. Within approximately five minutes of Andrews' initial call, Patterson contacted Andrews and instructed him that permission to search the vehicle was granted.[6]

---

2. When questioned about his past training and experience relating to detection of marijuana, Rath stated that during his military police training classes, they had received a lecture spanning several days on the detection of narcotic odors; that he had smelled marijuana prior to his military experience at events such as concerts; and that his total sensory contacts with marijuana were an estimated fifty times.

3. As to Watson's training and experience relative to the detection of marijuana, the witness stated that his familiarity stemmed from smoking marijuana himself; that he had been in the company of others who had smoked it; and that he would estimate his sensory contacts with marijauna to total approximately twenty-five times.

4. While the two military policemen were unable to identify the defendants in rela-

tion to where they were located in the van at that time, the government's memorandum states that Dennis A. Burrow was the driver; the individual seated in the front passenger seat was Danny Lee Sherman; and Douglas L. Fisher was the individual lying on the van's rear seat.

5. Private Randy Franklin is a named but unindicted co-conspirator. The indictment filed in the case states that it was part of the conspiracy that the defendants enter Fort Meade military installation and as a further part of that conspiracy to distribute cocaine, LSD and marijuana to unindicted co-conspirator Franklin.

6. This procedure was performed in accordance with military regulations concerning searches pursuant to authorization based on probable cause from the base commander. *See* discussion *infra*.

The military policemen then proceeded to search the van's interior. At the rear of the driver's side of the vehicle, Rath located a space in the panelling from which he removed a ten inch square plastic bag, containing suspected marijuana. He also located thirty-one packets of tinfoil containing white powder.[7] Watson, who also participated in the search, located a cigarette roller, papers and a bag of marijuana wrapped in plastic under a mat by the engine compartment.[8]

The government, in responding to the motion to suppress, admits the fact that this was a warrantless search; however, it asserts *inter alia* that it was based on probable cause, and as such was a valid search pursuant to regulations concerning the search and seizure of possessions under the control of civilians on a military post. The government also contends that the search falls within the automobile exception to the warrant requirement of the Fourth Amendment.

### Probable Cause

■ In dealing with probable cause, a court must deal with probabilities. "These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), *reh. den.*, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949). While probable cause means more than bare suspicion, *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *United States v. Day*, 455 F.2d 454, 456 (3d Cir. 1972), it also requires less than

evidence which would justify condemnation or conviction. *Brinegar v. United States*, 338 U.S. at 175, 69 S.Ct. at 1310, *citing Locke v. United States*, 7 Cranch 339, 348, 11 U.S. 339, 3 L.Ed. 364. As stated in *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), probable cause exists where "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. The Court finds that the military police, under the facts and circumstances of this case, had probable cause to believe that the vehicle contained contraband and that a crime had been or was being committed, and that the van contained the instrumentalities or fruits of that crime.

■ Both Rath and Watson smelled the odor of marijuana coming from the truck. It is well settled, at least within the Ninth Circuit, that smell alone is sufficient to constitute probable cause for a subsequent search for marijuana. *United States v. Barron*, 472 F.3d 1215 (9th Cir. 1973); *United States v. Leazar*, 460 F.2d 982 (9th Cir. 1972); *United States v. Campos*, 471 F.2d 296 (9th Cir. 1972); and *Fernandez v. United States*, 321 F.2d 283 (9th Cir. 1963); such also now seems to be the law in the Tenth Circuit, *see United States v. Bowman*, 487 F.2d 1229 (10th Cir. 1973), *relying on United States v. McCormick*, 468 F.2d 68 (10th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1361, 35 L. Ed.2d 588 (1973). In other circuits, the smell of marijuana constitutes a valid

---

7. This "white powder" was originally believed to be cocaine, but subsequent analysis disclosed that the packets contained a narcotic known as PCP, phencyclidine.

8. The government's memorandum filed in opposition to the motion to suppress states that the total product of the search consisted of "a small bag of marijuana, a package of rolling papers, and a small cigarette roller

on the engine compartment; a brass smoker's pipe and a roach clip in the ashtray; and 14 plastic bags containing 69 plastic bags of marijuana (a total of approximately 2,222.6 grams), 186 dosage units of LSD and 31 individual packets containing what was originally believed to be cocaine but later determined to be PCP, all of which were concealed behind the panelling of the van."

factor in making a probable cause determination, *see, e.g., United States v. Halliday,* 487 F.2d 1215 (5th Cir. 1973).[9]

 Under either principle, it is clear that probable cause for conducting a search existed under the facts of this case. In addition to smelling the odor of marijuana, Rath observed a brass smoking pipe which he recognized from his training and experience as being an instrument used for smoking marijuana. Furthermore, while not sufficient by itself, the demeanor of two of the defendants, one sleeping on the back seat and the front seat passenger appearing drowsy or sleepy, would, in this Court's estimation, be an additional relevant circumstance justifying a reasonable belief that the crime charged had been or was being committed. Finally, after defendants alighted from the vehicle, but before the search, Watson observed what he believed was a "roach" on the front passenger side of the floor and roll paper.[10] Taking all these circumstances into consideration, even if the odor of marijuana were to be treated merely as a valid factor rather than dispositive of the issue, this Court is of the opinion that probable cause to search clearly existed in the present case.

### Search Pursuant to Military Regulations

Army Regulation No. 210-10, Paragraph 1-15, provides in pertinent part that:

The installation commander will establish rules governing the entry into and exit from the installation, and the search of persons and possessions as limited in *a* through *e* below:

a. The installation commander may direct authorized guard personnel, while in the performance of assigned duty, to search the persons and possessions, *including vehicles,* or any persons (including military personnel, employees, and *visitors*) upon their entering, *during their stay on,* or upon leaving *facilities over which the Army has responsibility. Such searches are authorized when based upon probable cause that an offense has been committed or upon military necessity.* Instructions of commanders regarding such searches should be specific and complete. * * *

Pursuant to the above directive, the installation commander at Fort George G. Meade promulgated "Fort George G. Meade Supp. 1 to AR 27-10, Page 2-12, Paragraph 2-37, which provides in pertinent part as follows:

(c)(6) *By Authority of Commander Based on Probable Cause:* Probable cause to justify a search by the authority of the Commander is the reasonable belief that specific contraband or specific evidence of a crime is in the immediate possession of the person or within the place to be searched. * * * The place to be searched must be within the control of the Command-

---

9. While not a case dealing with the detection of marijuana, the Fourth Circuit's opinion in *United States v. Bradshaw,* 490 F.2d 1097 (4th Cir. 1974) is of significance. In Bradshaw, the Court was concerned with the issue of probable cause regarding a search and seizure of moonshine whiskey. The Fourth Circuit stated:
We have no doubt that, at the point at which Agent Williams smelled the distinctive odor of moonshine whiskey emanating from the truck, he had probable cause to believe that the truck contained contraband. 490 F.2d at 1101.

10. These objects, according to the unrebutted testimony were in Watson's plain view. As

recognized in *Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed. 2d 564 (1971), *reh. den.,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), although insufficient by itself to justify a warrantless seizure of evidence, incontrovertible evidence of the senses that an incriminating object is on the premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. Furthermore, it can hardly be said that the military policemen did not have a right to be in a position to see these objects or that the discovery was anticipated. *See Coolidge v. New Hampshire,* 403 U.S. at 469-70, 91 S.Ct. at 2040.

er authorizing the search \* \* \* [A] commander should not authorize searches based on the mere conclusion of others that probable cause exists but must assure that all available information is communicated to him in detail and then exercises his own discretion as to whether the information available justifies a search. In making this judgment he should seek the advice of the Staff Judge Advocate's Office during duty hours and the Judge Advocate On-Call Officer during non-duty hours.

\* \* \* \* \* \*

f. *Restriction on Authority to Search*: The following restrictions are placed on authorities to search.

\* \* \* \* \* \*

(2) *Non-Military Personnel and their Property*: Searches of non-military personnel and their property, other than those searches made incident to apprehension or to prevent removal of criminal goods, may be made only after having obtained approval from the Post Commander or his delegate.

At the suppression hearing held in this matter on May 30, 1975, the uncontroverted facts established that the above regulations were literally complied with in this instance. This procedural regularity notwithstanding, defendants contend that a probable cause search of a civilian or his property while on a military installation is in contravention of the Fourth Amendment's proscription against unreasonable searches and seizures in that the authority to search was not based on probable cause *supported by oath or affirmation*.

This contention requires the Court to carefully examine the nature of a civilian's Fourth Amendment rights while on property within the exclusive control of the military.

While a number of decisions may be found dealing with the relationship between an individual's constitutional rights and the power of military authorities to affect those rights, it would appear that the specific issue presently before the Court is one of first impression.

The law in this Circuit is clear that when specific congressional authorization exists, "a search of property located within a military installation and occupied by persons subject to military law is valid when authorized by a commanding officer having jurisdiction over the place where the property is" located. *United States v. Grisby*, 335 F.2d 652 (4th Cir. 1964).

This Court does not suggest that defendants were "persons subject to military law." To do so would contravene the principle, recognized by the Supreme Court, that civilians on military installations are in fact, not "persons subject to military law." *See, e.g., Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).[11]

Moreover, with respect to the assertion of constitutional rights by civilians and members of the military, the unique status of military personnel may at times mandate different criteria. *Cf. Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).[12]

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it. 417 U.S. at 758, 94 S.Ct. at 2563.

11. *Reid v. Covert, supra*, dealt with two consolidated cases in which wives of military personnel had murdered their husbands. The *Reid* Court held that the provisions of the Uniform Code of Military Justice extending court-martial jurisdiction to persons accompanying the armed forces outside the continental limits of the United States could not be constitutionally applied to the trial of civilian dependents of members of the armed forces overseas, in times of peace, for capital offenses.

12. Mr. Justice Rehnquist, speaking for the majority of the Court, stated:

It is precisely because of the unique status of military installations that the Court concludes that a warrantless search, authorized on the basis of probable cause unsupported by oath or affirmation, was reasonable under the facts and circumstances of this case.

■ Clearly, the Fourth Amendment prohibits only unreasonable searches and seizures. As stated in *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374. (1931), "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *See also Harris v. United States*, 331 U.S. 145, 150, 67 S. Ct. 1098, 1101, 91 L.Ed. 1399 (1947), *reh. den.*, 331 U.S. 867, 67 S.Ct. 1527, 91 L.Ed. 1871 (1947).

■■ Reasonableness, therefore, is a flexible standard. It has long been recognized that military personnel, and those who enter upon a military reservation, surrender some of their individual rights so that military discipline and security may remain inviolate. *United States v. Miller*, 261 F.Supp. 442, 449 (D.Del.1966); *see United States v. Crowley*, 9 F.2d 927 (N.D.Ga.1922); *United States v. Grisby*, 335 F.2d 652, 654–55 (4th Cir. 1964). It is equally well established that the courts have recognized the commander's duty to maintain the order, security and discipline necessary to military operations. *United States v. Gourley*, 502 F.2d 785, 787 (10th Cir. 1973); *see Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Weissman v. United States*, 387 F.2d 271 (10th Cir. 1967); *United States v. Miller, supra*; *Wallis v. O'Kier*, 491 F.2d 1323, 1325 (10th Cir. 1974); *United States v. Vaughan*, 475 F.2d 1262, 1264 (10th Cir. 1973); *United States v. Crowley, supra*; *United States v. Grisby, supra.*

■ The means by which this duty may be fulfilled, however, vary, and, therefore, a court should take into consideration a number of factors when called upon to determine the reasonableness of an intrusion upon the constitutional rights of others. Included among these factors are considerations such as the nature of the military installation, the competing interests of the individual on the one hand and that of the military on the other, and the specific nature of the method utilized by the commander in so affecting another's constitutional rights.

■ As to the nature of the military installation, it is clear from an analysis of the recent decisions relating to the right of military commanders to infringe on the First Amendment rights of civilians that the "open" or "closed" character of the post is a critical factor in judging the propriety *vel non* of the commander's action.

In *Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Supreme Court sustained the action of a post commander who summarily denied a civilian employee access to the installation for security reasons. The Gun Factory, on the premises of which petitioner worked as a short-order cook, was engaged in designing, producing and inspecting naval ordinance, including the development of weapons systems of a highly classified nature. In approving the summary action of the base commander, the Supreme Court, recognizing that the Navy regulation forming the basis of respondent's action was clearly within the constitutional powers granted to both Congress and the President to promulgate regulations controlling access to a military base, stated that the regulation was "the verbalization of the unquestioned authority which commanding officers of military installations have exercised throughout our history." *Id.* at 892, 81 S.Ct. at 1747. Following *Cafeteria Workers*, a number of decisions recognized the right of a base commander to summarily exclude from the installation those attempting to assert their First Amendment rights, but who

were barred by the exercise of his discretionary authority to exclude those persons inimical to security, discipline and morale. *Kiiskila v. United States,* 466 F.2d 626, 628 (7th Cir. 1972); *see also Bridges v. Davis,* 443 F.2d 970, 975 (9th Cir. 1971); *cf. Schneider v. Laird,* 453 F.2d 345 346–47 (10th Cir. 1972).

However, a little more than a decade after *Cafeteria Workers* had been decided, the Supreme Court in *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), placed a limitation on the heretofore seemingly unfettered [13] discretion of a base commander when the area sought to be barred from access was open to the general public.

As stated by Supreme Court in its *Flower* decision:

[When such area is open to the public generally,] the military has abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue. The base commandant can no more order petitioner off this public street because he was distributing leaflets than could the city police order any leafleteer off any public street. 407 U.S. at 198, 92 S. Ct. at 1843.

For subsequent lower court decisions implementing this criterion in similar First Amendment cases, *see Burnett v. Tolson,* 474 F.2d 877 (4th Cir. 1973);

*United States v. Gourley, supra; Spock v. David,* 469 F.2d 1047, 1053–54 (3rd 1972); *cf. United States v. Floyd,* 477 F.2d 217 (10th Cir. 1973), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973).

This factor concerning the nature of the installation also appears to have marked significance in Fourth Amendment cases. Without the benefit of any Supreme Court pronouncement in a Fourth Amendment framework, an unavoidable inference to be drawn from the existing reported case law is that the permissible nature of the infringement on Fourth Amendment guarantees is conditioned by the character of the base.

In *United States v. Vaughan,* 475 F.2d 1262 (10th Cir. 1973), the Tenth Circuit was concerned with a search which occurred at a closed military installation in Oklahoma, known as Tinker Air Force Base.[14] Although finding that the district court erred in its denial of defendant's motion to suppress [15] the Court stated:

The Government also points to the large sign posted at the entrance to the Air Force Base and says that consent to the search may be implied.

The sign read as follows:

*"Warning. U.S. Air Force Base. It is unlawful to enter this area*

13. The only cognizable basis for challenging the summary action of a base commander in such instances appears to have been a contention that his action was patently arbitrary or discriminatory. *See Bridges v. Davis,* 443 F.2d 970, 975 (9th Cir. 1971), *citing Cafeteria Workers* and *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

14. While it is not clear from the *Vaughan* decision itself whether Tinker was a closed or open base, such is the clear inference to be drawn from the recitation of facts. Furthermore, this inference is transformed into concrete factual statement by the subsequent Tenth Circuit opinion in *United States v. Floyd,* 477 F.2d 217 (10th Cir. 1973), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed. 2d 336 (1973), which also dealt with Tinker Air Force Base and characterized the instal-

lation as being a closed base. *Id.* at 222–25. *Cf. United States v. Gourley,* 502 F.2d 785, 788 (10th Cir. 1973).

15. The Tenth Circuit based its reversal ruling on the fact that the military authorities, who conducted the search at the entrance gate of the installation, never had any intention whatsoever of permitting Vaughan to enter the base. Such being the case, in order to maintain security and order, the guard should simply have turned him away when he sought entrance. Under the circumstances of the case, the Court stated, for the search and seizure to stand, it would have to meet the standards of a search conducted on any public street. Since there was no probable cause for the search, nor any consent given, nor was it incident to a lawful arrest, the search was invalid. 475 F.2d at 1264.

*without permission of the commander of Tinker Air Force Base. While on this installation all personnel and the property under their control are subject to search."*

While we agree, as we said before, that *once within the area where security was imposed, a search conducted without probable cause and without consent could be proper. Also the submission to search could be imposed as a valid condition to gaining access to the base.* However, once a determination has been made not to allow defendant entry to the base, any search conducted thereafter must meet Fourth Amendment standards. 475 F.2d at 1264 (emphasis added).

■ *Vaughan,* therefore, clearly stands for the proposition that given a closed base, civilians are subject to warrantless search without consent and even in the absence of probable cause.[16]

■ Furthermore, while the Fourth Circuit's decision in *United States v. Grisby, supra,* dealt with the validity of the search of a military man's quarters, it nevertheless gives support to the general proposition that searches of civilians and their property, in the military context, need not always comply with the strict Fourth Amendment standards imposed in the civilian context.[17]

■ While the Court has been unable to find any authority dealing with the search of civilians on an open military installation, nor has counsel for either side cited any such authority, the present state of the law, at least inferentially, is that the open or closed character of the base is a pertinent factor in determining the reasonableness of a search. In the military context, the courts have demonstrated a willingness to preserve the longstanding and well recognized duty of a base commander to maintain security, order and discipline within his command and over the installation for which he is responsible. The more the public or national interest is involved, as in the case of a closed, top-security installation, the more the judiciary may weigh this in the scale in determining whether the recognized constitutional right of individuals, including civilians who seek and gain entrance to military installations, to be free from unreasonable searches has been invaded.

■ Although courts are constant in their recognition of the responsibilities of a base commander and cognizant of the paramount need for security which exists on military installations, they are also most careful in their protection of an individual's rights secured him by the Constitution. "Individual rights are zealously guarded against expansion of military authority, or any attempted extension of military justice's summary procedures." *United States v. Miller,* 261 F.Supp. at 446; *see Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); *Reid v. Covert, supra.* The Fourth Amendment guarantees to all citizens the right to be secure in their persons, houses, papers, and effects against all unreasonable searches and seizures. When this right comes into conflict with another well recognized interest, the courts must engage in a sensitive balancing test. The resolution of

---

16. The *Vaughan* decision has twice been cited with approval by the Tenth Circuit, *see United States v. Floyd,* 477 F.2d at 221, 222; *United States v. Gourley,* 502 F.2d at 788.

17. As stated by the *Grisby* Court:
 *Just as in some contexts the military must and does have authority to conduct searches without probable cause, so in some contexts it must and does have authority to conduct searches without the authorization of civilian process.* The military picket's search of automobiles entering a military reservation is such an example. When, also military personnel are without the boundaries of the fifty United States, the military cannot be dependent upon civilian authority of the United States or that of a foreign nation, particularly one with which we may be at war. *So long as in those circumstances it acts in accordance with military law, or the laws of war, its searches are lawful and evidence obtained is admissible in subsequent proceedings.* 335 F.2d at 655 (emphasis added).

the issue must, therefore, hinge upon the reasonableness of the method or means employed by the authority infringing on another's constitutional right to be free from unreasonable searches and seizures.

■ In essence, this Court would concur with the proposition that civilians are not subject to a general warrantless search in those situations not evidencing a particular need for security, discipline and order or characterized by peculiarly exigent circumstances.[18]

In *Saylor v. United States*, 374 F.2d 894, 179 Ct.Cl. 151 (1967), the United States Court of Claims sustained a claim for the recovery of back pay brought by a discharged civilian military employee, whose discharge was directly attributable to evidence unlawfully seized from his home and automobile. In so ruling, the Court of Claims expressly rejected the military's use of a standard form "Authority to Search," which had been signed by a Colonel who was the Deputy Commander for Administration, on the grounds that this officer was not an impartial magistrate or the equivalent of one; there was no oath or affirmation either by those conducting the search or anyone else; the authorizing Colonel made no finding of probable cause and none was made known to him, and so far as could be ascertained from the record, there was, in fact, no probable cause for the search. Taking these factors into consideration with the fact that the "Authority to Search" was totally unlimited as to the description of what could be seized, the Court of Claims found the "Authority to Search" to be, in effect, a general warrant ". . . which has been forbidden in Anglo-American law for two centuries. *Stanford v. State of Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.

Ed.2d 431 (1965) . . . ." 374 F.2d at 898.

The factual background in *Saylor* clearly distinguishes it from situations such as searches by post guards of those seeking admission to the installation, *see United States v. Crowley, supra; cf. United States v. Grisby, supra,* or the unconsented searches, without probable cause, of those entering or already upon the premises of a closed military installation, *see United States v. Vaughan, supra,* or for that matter, any situation relating to the security, order and discipline of the base. As stated by the Court of Claims in making its determination of unlawful search:

The possible allegations against plaintiff, implicit in the private complaint against him and the then current rumors, involved fraud and conflict-of-interest in carrying on his job of helping to provide entertainment for the troops—not violence, the security or safety of the command, the discipline of servicemen, subversion, or even the theft and embezzlement of federal funds. So far as we can tell, there was no need for an immediate search to prevent use or disposition of weapons, or the instruments or fruits of crime. There was, in other words, no emergency; as a matter of fact, the military waited some time (apparently a month or two) after receiving the private complaint before executing the search. 374 F.2d at 899–900.

■ Under such facts and circumstances, a general warrantless search was clearly an unreasonable search and seizure under the Fourth Amendment. However, the Court does not understand the *Saylor* decision to stand for the proposition that under certain emergency conditions or exigent circumstances

---

18. In a number of decisions, courts have upheld the infringement of a civilian's constitutional rights when exigent circumstances warranted such infringement. *See, e. g., Grewe v. France,* 75 F.Supp. 433 (E.D.Wis. 1948); *Hines v. Mikell,* 259 F. 28 (4th Cir. 1919); *Ex parte Falls,* 251 F. 415 (D.N.J. 1918); *McCune v. Kilpatrick,* 53 F.Supp. 80 (E.D.Va.1943); *Perlstein v. United States,* 151 F.2d 167 (3d Cir. 1945); *In re Berue,* 54 F.Supp. 252 (S.D.Ohio 1944); *Ex parte Jochen,* 257 F. 200 (S.D.Tex.1919). *Cf. Reid v. Covert,* 354 U.S. at 33 n. 59, 77 S.Ct. at 1239 n. 59.

or in the reasonable exercise of authority in order to maintain the security, order and discipline of a military installation, a search of a civilian and the property under his control without a warrant based on probable cause not supported by oath or affirmation would be unreasonable under the Fourth Amendment.

Circumstances such as those referred to in *Vaughan* and *Grisby* notwithstanding, it has been held by one court that where the search is to be made of property in the possession or under control of a person in the command of the officer issuing the warrant, a search made pursuant to a warrant issued upon probable cause not supported by oath or affirmation, by the commanding officer of the military installation, is a valid search. *Wallis v. O'Kier*, 491 F.2d 1323, 1325 (10th Cir. 1974).

The search in the present matter was conducted pursuant to authorization obtained from the commanding officer based upon probable cause unsupported by oath or affirmation. Relying upon authorities recognizing the different constitutional treatment of civilians and members of the military such as *Ex parte Milligan, supra* and *Reid v. Covert, supra*, defendants urge that *Wallis* should be read to imply that a search under the circumstances shown in the present case is constitutionally unreasonable as against civilians. In the Court's view, such a reading would be an unwarranted extension of the actual holding in *Wallis*.

First, nowhere in *Wallis* does the Tenth Circuit indicate that a search of a civilian under similar authorization, given appropriate circumstances, would be unreasonable; the *Wallis* decision does not make even a fleeting reference to the civilian-military dichotomy as regards searches and seizures. Secondly, the Court finds it hard to believe, if the inference defendants seek to draw from *Wallis* were, in fact, a reasonable inference, that the Tenth Circuit would fail to make any reference whatever to its previous decision concerning civilian

searches on military bases, namely, *United States v. Vaughan, supra*. There is nothing in the *Wallis* decision which would permit or enable this Court to draw the inference defendants suggest. The holding in *Wallis* is limited to the facts from which it arose. What *Wallis* does afford, however, is a premise on which this Court may determine the reasonableness of the procedures employed by the military authorities in the present case.

In noting that the draftsman of the applicable section of the Manual for Courts-Martial omitted the requirement that probable cause be supported by oath or affirmation, the *Wallis* Court stated:

It is apparent that the omission of a reference to oath or affirmation was deliberate and intentional. There are reasons for such an inference. Although this was probably not such a case, many situations have existed and will exist in military commands where the formalizing of the probable cause by the affixing of a seal to a paper writing would be impractical or impossible. Such a construction has been placed upon the provision by the military courts. 491 F.2d at 1325.

This impracticality or impossibility, referred to by the *Wallis* Court in the case of military personnel, has even more point where civilians not under military control and only temporarily on the base are apprehended under circumstances which would give a reasonable person probable cause to believe a crime has been or is being committed which may affect the security, order or discipline of the installation. In the present matter, the military policemen unexpectedly came upon an unregistered out-of-state vehicle, which was occupied by three civilians and located in a parking lot adjacent and with access to a public road. They were informed by the driver of that vehicle that he and his companions were on the post in order to see a friend stationed there. Based upon the evidence of their senses of sight and smell and their training and experience,

they had probable cause to believe that the occupants of the van had used and, therefore, had access to a controlled narcotic substance, marijuana.

Had defendants been discovered on a closed military installation, this Court would have no hesitation sustaining the search and seizure whether or not probable cause existed. It is only because of the fact that Fort George G. Meade is an open post that a more searching inquiry into possible Fourth Amendment violation is required.

■■■ Although the Court in different circumstances might find, even on a military base, that a search based upon probable cause unsupported by oath or affirmation was unreasonable, it does find under the facts and circumstances of the present case, wherein exigent circumstances exist affecting the commanding officer's interest in maintaining the security, order and discipline of his post that the search was properly and duly authorized and was reasonable within the meaning of the Fourth Amendment.

### AUTOMOBILE EXCEPTION

The Court also finds that the search and seizure which occurred in this case is valid under the so-called "automobile exception" to the warrant requirement of the Fourth Amendment.

■■■ It is well established that searches conducted outside the judicial process are *per se* unreasonable under the Fourth Amendment—subject only to a few specially established and well delineated exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564, *citing Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). While it is equally well established under *Coolidge* that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," 403 U.S. at 461–62, 91 S.Ct. at 2035, it is also clear that the Supreme Court, in terms of the circumstances justifying a warrantless search, has long distinguished between an automobile and a home or office. *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 453 (1925); *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970), *reh. den.,* 400 U.S. 856, 91 S.Ct. 23, 35 L.Ed.2d 297 (1970).

This distinction is premised on the rationale of *Carroll* that there is:

a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile for contraband goods, where *it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.* 267 U.S. at 153, 45 S.Ct. at 285.

■■■ For the automobile exception to apply, the arresting officer must have probable cause to believe that the vehicle contains contraband or the fruits or instrumentalities of crime, and exigent circumstances must exist which would make the securing of a warrant impracticable. *Carroll v. United States, supra; Coolidge v. New Hampshire, supra.* Undoubtedly, *both* elements must exist for the exception to apply. As stated in *Coolidge v. New Hampshire,* 403 U.S. at 468, 91 S.Ct. at 2039, no amount of probable cause can justify a warrantless search and seizure absent exigent circumstances. Furthermore, as noted by the Supreme Court in *Almeida-Sanchez v. United States,* 413 U.S. 266, 269, 93 S.Ct. 2535, 2537–38, 37 L.Ed.2d 596 (1973), "the *Carroll* doctrine does not declare a field day for police in searching automobiles. Automobile or no automobile, there must be probable cause for the search." In the present matter, both elements required under the automobile exception are present.

The Court has previously found that probable cause existed under the facts and circumstances of this case. What remains to be determined, therefore, is

whether the circumstances attending the arrest and search displayed the required exigent circumstances needed for the search and seizure to fall within the automobile exception to the rule forbidding warrantless searches.

On this aspect of the matter, the Court could simply refer to the finding of exigency made with regard to its prior discussion as to the validity of the search pursuant to military regulations. However, due to the uncertainty and confusion of the present state of the law with regard to what constitutes exigent circumstances under the automobile exception, a more detailed analysis is indicated.

The Supreme Court in *Coolidge v. New Hampshire, supra,* noted:

> As we said in *Chambers, supra* [399 U.S.] at 51, 90 S.Ct., at 1981, 'exigent circumstances' justify the warrantless search of 'an automobile *stopped on the highway,*' where there is probable cause, because the car is 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' '[T]he opportunity to search is fleeting * * *.' (Emphasis supplied by the plurality in *Coolidge*) 403 U.S. at 460, 91 S.Ct. at 2035.

As discussed previously, the facts adduced at the suppression hearing in this matter disclosed that the van occupied by defendants, when first observed by the military policemen, was stationary in the parking lot behind the post field house. However, the fact that the vehicle was not *moving on the highway* when the arrest took place, is of no significance. First, a *moving* vehicle is not the *sine qua non* for the exception; the proper test is whether or not the vehicle was *movable. Carroll v. United States, supra; Chambers v. Maroney,* 399 U.S. at 51, 90 S.Ct. at 1981.

Secondly, the fact that the vehicle was located on a parking lot, as opposed to the open highway, is also of no real significance. The evidence clearly demonstrated that at least three roads were immediately accessible to the driver of the van. Since the criterion is a movable, as opposed to moving, vehicle, whether that vehicle is on the open highway or in a parking lot with readily accessible modes of egress to the open highway is a distinction without substance and meaning. It is also of some significance to note that in *Chambers v. Maroney,* the occupants of the car were arrested "in a dark parking lot in the middle of the night." 399 U.S. at 52 n. 10, 90 S.Ct. at 1981 n. 10.

Finally, as to both the issue of moving-moveable vehicle and open highway, as opposed to parking lot, the recent decision of the Seventh Circuit in *United States v. Darrow,* 499 F.2d 64 (7th Cir. 1974), affords a backdrop for analytical comparison.

Defendants were found guilty of possessing and passing counterfeit bills. During the early morning hours on the day they were arrested, they had patronized a tavern in Indiana and in payment of their bill, had given the waitress a counterfeit $20 note. When this was brought to the attention of the manager, he instructed the waitress to stall them while he contacted the police. By the time the police arrived, defendants were engaged in an argument concerning the return of their change. In the light of the disturbance, they were first arrested for disorderly conduct. After they were arrested, they were searched for weapons. In addition to large amounts of legitimate bills, a set of Oldsmobile keys was also found in one defendant's pocket; these items were returned to him. After a request for identification was made, defendants gave the officers their Kentucky drivers' licenses. One of the officers then proceeded to search the parking lot for a vehicle bearing Kentucky license plates. When he located such a vehicle, he attempted to ascertain whether it belonged to any of the patrons then in the tavern; no one claimed the car.

In response to a request by the local police, a Secret Service agent arrived at the tavern, observed the bogus bills, and upon looking inside the locked Kentucky automobile, observed a rolled-up sock in a trash container in the front seat. The car was removed to police headquarters where, upon a search warrant being obtained, the car was unlocked in order to conduct an inventory of its contents. The sock was opened and a number of counterfeit bills were found therein.

After finding that the search of the vehicle could not withstand attack on the basis that it was conducted pursuant to a warrant, due to the fact that the affidavit supporting the warrant was defective, the Seventh Circuit sustained the lower court's refusal to suppress the evidence on the basis that the search fell within the automobile exception as stated in *Chambers v. Maroney, supra.* Noting that the car at the time of arrest in *Chambers* was also located in a parking lot, and that the search of the *Chambers* vehicle occurred at the police station some time after the actual arrest, the Seventh Circuit also pointed out the fact that in *Chambers*, "[t]he Court concluded that the car remained readily movable, despite the arrest of the occupants and the apparent lack of evidence that anyone was actually coming to pick up. [399 U.S.] at 51, 90 S. Ct. 1975." 499 F.2d at 69.

In the present case, the facts and circumstances are more exigent than those displayed in *Darrow*, or even *Chambers*, for that matter. Burrows, the driver of the van, had been altered to the fact that the military policemen were present; the vehicle certainly was movable; there was in the area a confederate, Private Franklin, whom the defendants had come to see and who reasonably could be characterized as a threat to the military's continued maintenance of the contraband and the instrumentalities and fruits of crime; and the vehicle could not be secured, as Burrow himself stated. A comparison of the factual patterns in either *Chambers* or *Darrow* with that of the present case clearly demonstrates the compelling character of the "exigent circumstances" in the case at bar.

Defendants have urged the Court to recognize that once they had been placed under arrest by the military policemen, the opportunity to search was no longer fleeting and that it was practicable to obtain a warrant prior to the search being conducted. Of course, the testimony did indicate from the point at which defendants were arrested until the time of the search, the vehicle was without interruption under the control and guard of the military policemen. Such being the case, it would not be impossible, although it may well have been impracticable, for the arresting military policemen to obtain a warrant to search the vehicle. Nevertheless, to suppress the evidence on this basis would be in direct contravention of the principles of *Chambers v. Maroney, supra,* in which the Supreme Court stated:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable. 399 U.S. at 51–52, 90 S.Ct. at 1981.

As stated by the Supreme Court in *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967) *citing United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed.

653 (1950):[19] "It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.'"

█ The practicability *vel non* of obtaining a warrant, if *Chambers* is to have any meaning whatsoever, must be determined in light of the facts and circumstances existing at the point when a determination is made to stop the vehicle, or to arrest its occupants; in other words, at some *initial* point of contact, not after the vehicle has been impounded or its occupants placed under arrest. If the law were to the contrary, one would be hard put to conjure up any situation in which exigent circumstances would exist. Once the authorities had placed the occupants of the vehicle under arrest and stationed a guard to secure the vehicle, they would be required to obtain a warrant in order to search the vehicle. Such a proposition of law is completely contrary to the holding of *Carroll* and *Chambers*. Indeed, if such were the law, there would be no automobile exception to the Fourth Amendment's warrant requirement. In *Chambers,* once the occupants were removed from the vehicle at the parking lot, the police would have been required to secure the vehicle by posting a guard or impounding the vehicle, and then to secure a warrant before engaging in any search. *Chambers* is explicit that such is not a requirement under the Fourth Amendment. Once a vehicle is under police control, the opportunity to search is no longer fleeting; there is no realistic chance that the contraband or instrumentalities or fruits of a crime will be lost; it is unrealistic to fear that the

vehicle will be moved by anyone other than by law enforcement officers. Therefore, it must stand to reason that exigent circumstances are those circumstances existing at the initial point of contact with the vehicle. Under the facts and circumstances of this case, it is clear to the Court, as noted previously, that such exigent circumstances did, in fact, exist in this case.

Finally, this is not a case, as defendants contend, comparable to *Coolidge v. New Hampshire, supra.* The only factor which the *Coolidge* facts have in common with those of the present case is that the possession searched was a motor vehicle. As stated by the Supreme Court in *Coolidge*:

> In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of the house. The opportunity for the search was thus hardly 'fleeting.' The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous. 403 U.S. at 460, 91 S.Ct. at 2035.

Although distinguishable from the present case, *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325

---

19. Of course, there is no questioning the fact that the search-incident exception under *Rabinowitz,* see also *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), was expressly overruled by *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). However, a clear reading of *Chimel* indicates that the principle quoted here from *Rabinowitz* was never expressly or impliedly rejected by *Chimel.* Therefore, since *Chimel* expressly limits its overruling of the *Rabinowitz* and *Harris* cases, "insofar as the principles they stand for are inconsistent with those that we have endorsed today . . . ." 395 U.S. at 768, 89 S.Ct. at 2043, the Court would view the above-quoted language of *Rabinowitz* as a viable principle of law.

(1974), is a clear indication of the basis for the different treatment to be accorded a given set of facts and circumstances under *Coolidge* and *Chambers*:

Respondent asserts that this case is indistinguishable from *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971). We do not agree. * * * Since the Coolidge car was parked on the defendant's driveway, the seizure of the automobile required an entry upon *private property*. Here, as in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the automobile was seized from a *public place* where access was not meaningfully restricted.[20] This is, in fact, the ground upon which the *Coolidge* plurality opinion distinguished *Chambers*, 403 U.S., at 463 n. 20, 91 S.Ct., at 2036. * * * (emphasis added) 417 U.S. at 593, 94 S.Ct. at 2471.

■ We hardly are concerned here with the search of a vehicle parked on private property, or a situation in which the law enforcement agents had suspected criminal involvement for a period of time. Defendants' vehicle was located on public property and the probable cause giving rise to the search was contemporaneous with the awareness of its existence. Clearly, this case is controlled by the principles of *Chambers*, not *Coolidge*.

Therefore, under the facts and circumstances of this case, it is the opinion of the Court that the search and seizure were valid under the automobile exception to the warrant requirement of the Fourth Amendment.

### CONCLUSION

Therefore, for the reasons stated in this opinion, it is this 12th day of June, 1975, by the United States District Court for the District of Maryland, hereby

20. As to this distinction between public and private property and its effect upon the reasonableness standard of the Fourth Amend-

*Ordered*:

that the motion to suppress all tangible evidence by the defendants, Danny Lee Sherman and Douglas L. Fisher be, and the same hereby is, *denied.*

ment, *see also United States v. Bradshaw*, 490 F.2d 1097 (4th Cir. 1974).